UNITED STATES, Appellee

v

CHARLES F. BURNEY, Contractor Technician, a person accompany-
ing the armed forces without the territorial jurisdiction
of the United States, Appellant

6 USCMA 776, 21 CMR 98

779

780

No. 7750

Decided March 30, 1956

*Major Edmund B. Sigman* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Stanley S. Butt.*

*Major John M. Rankin* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Emanuel Lewis.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused, a civilian employee of the Philco Corporation accompanying the Air Force outside the territorial jurisdiction of the United States, was convicted by a general court-martial of

assault with a dangerous weapon in violation of Article 128, Uniform Code of Military Justice, 50 USC § 722. He was sentenced to pay a fine of $750.00, and to be confined at hard labor until the fine was paid, but for not more than twelve months. Intermediate appellate authorities have affirmed, and this Court granted the petition for review for the sole purpose of determining whether the court-martial possessed jurisdiction to try the accused. Only the facts necessary to a proper understanding of that issue will be related.

At all times pertinent to this decision, the accused was a civilian employee of the Philco Television and Radio Corporation. He was stationed at an Air Force Base in Japan, and his sole reason for being overseas was that he was employed in the maintenance of Air Force technical equipment in use at that location. He was supervised by Air Force personnel, worked side by side with Air Force members, was billeted and fed at the Air Base, and was accorded Post Exchange privileges. The manner in which he performed his work and conducted his personal activities had a direct bearing on the efficiency, discipline, and reputation of the Air Force in that area.

On the night of December 29, 1954, the accused, a fancier of firearms, was present in his quarters, together with Mr. John L. Clark and Mr. Clifton H. King, who were fellow-civilian technicians at Johnson Air Force Base, Japan. After a discussion of weapons in general, and the nuances of a deadly form of horseplay called "Russian Roulette," the accused picked up one of his loaded revolvers, removed all of the cartridges except one, and, from a distance of five feet, pointed the weapon at Mr. Clark, despite that person's vigorous protests. Apparently acting on the premise that he knew the position of the loaded chamber in the gun, the accused pulled the trigger. As may be expected, he erred, and Mr. Clark was seriously wounded.

## II

At about the time when this petition for review was filed, the Supreme Court handed down its decision in Toth v

Quarles, 350 US 11, 76 S Ct 1, 100 L ed (Adv p 4) (1955), holding that an ex-serviceman, whose military status has been terminated by an honorable discharge and who is presently within the continental limits of the United States, is not amenable to court-martial jurisdiction for offenses committed prior to his discharge. As a predicate for that holding, the Supreme Court concluded that Article 3 (a) of the Uniform Code, 50 USC § 553, which purported to confer jurisdiction to try former members of the military, was unconstitutional. The accused Burney then amended his petition so as to raise the question of jurisdiction, an issue which he had not earlier disputed. This, of course, he had a right to do, for that issue may be raised at any time, and is always before us. More than that, we must satisfy ourselves on that score, and the result ordered in the Toth case, supra, together with some of the language used in the opinion, requires us to give extended consideration to the question of court-martial jurisdiction over this accused.

We must accept in its full import, as we interpret it, the doctrine announced by the Supreme Court in that case. However, a holding by that Court that one severable section of the Uniform Code is unconstitutional does not demand that we invalidate another. Section 2 of the Code, 64 Stat 145, embraces the usual savings clause, to the effect that each article, or part thereof, stands on its own foundation of legality, and is not affected by the invalidity of any other part of the enactment. Therefore, we are free to consider the question of jurisdiction in this instance, and are bound to, indeed entitled to, give effect only to the logic and reasoning expressed by the Supreme Court in Toth. In approaching our task, we must assume that the provisions of Article 2(11) of the Code, 50 USC § 552—which provide the basis for jurisdiction here and were not considered in Toth—are constitutional. Furthermore, all grants of jurisdiction to military courts found in the Code must be enforced by us unless we are convinced

that they are fundamentally hostile to military due process, or that they have been specifically condemned by the Supreme Court. Neither of these conditions has been met here.

The statute under which the accused became subject to court-martial jurisdiction is Article 2(11) of the Uniform Code of Military Justice, supra. To render easier the task of the reader in following the rationale which we will advance in support of our position, certain subsections of that Article dealing with civilians must be quoted. The parts of importance are as follows:

"The following persons are subject to this code:

· · · · ·

"(7) All persons in custody of the armed forces serving a sentence imposed by a court-martial;

· · · · ·

"(10) In time of war, all persons serving with or accompanying an armed force in the field;

"(11) Subject to the provisions of any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, all persons serving with, employed by, or accompanying the armed forces without the continental limits of the United States . . . [and the principal part of its territories]."

Because the subsections quoted above were not under attack in the Toth case, it would take stronger and more pointed language than we find in that decision to lead us to conclude that the Supreme Court intended to invalidate all sections of the Uniform Code authorizing the trial of civilians by military courts. Certainly, unless the Supreme Court is to retreat from its previously announced views on military jurisdiction over personnel directly connected with the armed forces, there is no substance to the contention now advanced before us that courts-martial cannot constitutionally proceed with the trial of any person not a member of the military forces. We believe that, historically, both military and civilian law will show the untenability of that assertion.

Since the Supreme Court's decision in Toth, supra, three Federal district courts have been called upon to grapple with the question of the constitutionality of Article 2(11) of the Code. In Covert v Reed, decided November 22, 1955, Judge Tamm, of the District Court for the District of Columbia, concluded that, under Toth, Mrs. Covert, the wife of an Air Force sergeant who allegedly murdered her husband while they were stationed in England, was entitled to a civilian trial. However, in Krueger v Kinsella, 137 F Supp 806, Judge Moore, of the District Court for the Southern District of West Virginia, reached the opposite conclusion. He held that Mrs. Smith, who was charged with killing her husband, a Colonel in the United States Army, while serving in Japan, was amenable to court-martial jurisdiction, and that Article 2(11) of the Code, which purports to grant such jurisdiction, is constitutional. On February 16, 1956, in Klinger v Commandant, United States Disciplinary Barracks, Lompoc, California, Judge James M. Carter, of the District Court for the Southern District of California, Central Division, held Article 2(11) of the Code to be a valid exercise of the Congressional power granted by the Constitution, to make rules for the government and regulation of the land and naval forces, as supplemented by the necessary and proper clause of the basic document. It is our conclusion that the two latter opinions, upholding jurisdiction, should be affirmed by the civilian appellate courts. Certainly the Article with which we deal can be supported by logic and the pages of history; it is not inconsistent with Toth; it accords with principles announced by the Supreme Court in a number of prior cases; and it comes within the constitutional grant of jurisdiction to the military services, as it is an enactment which aids directly in governing and regulating the land and naval forces. In order best to substantiate our position, we will first discuss those areas which have been left untouched by the Toth decision, and then move into the fields which may have been partially invaded.

### III

It has never been doubted, since the Supreme Court's decision in Dynes v Hoover, 20 How 65, 15 L ed 838 (1858), that Congress had and has the constitutional power to render persons actually in the military service liable to trial by court-martial for the crimes they commit. Furthermore, the specific exceptions in the Fifth Amendment of "the trial of cases arising in the land or naval service from the ordinary provisions of law" (Attorney General Cushing, 43 Barbour 569 (NY)) is one that is contemplated by Article I, Section 8, Clause 14, of the Constitution itself, which empowers Congress, "To make Rules for the Government and Regulation of the land and naval forces." In the words of Chief Justice Chase, speaking in Ex parte Milligan, 4 Wall 2, 137, 18 L ed 281 (1866):

"The Constitution itself provides for military government as well as for civil government.

. . . . .

". . . there is no law for the government of the citizens, the Armies or the Navy of the United States, within American jurisdiction, which is not contained in or derived from the Constitution."

Not only does the power to make rules for the regulation of the land and naval forces authorize Congress to permit the military services to try their members without an indictment by a grand jury, it also empowers Congress to prescribe a trial for military personnel before triers of fact other than a jury of the State or District wherein the crime was committed. In Ex parte Quirin, 317 US 1, 63 S Ct 2, 87 L ed 3 (1942), we find the following language:

"The fact that 'cases arising in the land or naval forces' are excepted from the operation of the Amendments does not militate against this conclusion. Such cases are expressly excepted from the Fifth Amendment, and are deemed excepted by implication from the Sixth. Ex parte Milligan, supra, 4 Wall 123, 138, 139, 18 L. Ed. 281. It is argued that the exception, which excludes from the Amendment cases arising in the armed forces, has also by implication extended its guaranty to all other cases; that since petitioners, not being members of the Armed Forces of the United States, are not within the exception, the Amendment operates to give to them the right to a jury trial. But we think this argument misconceives both the scope of the Amendment and the purpose of the exception."

Thus, we consider the law well settled that whether they are within or without the territorial limits of the United States and its possessions, members of the military establishment who are on active duty (Compare Johnson v Sayre, 158 US 109, 15 S Ct 773, 39 L ed 914 (1895), with respect to members of the militia who are not on active duty) can constitutionally be tried by a court-martial.

### IV

Moving on to the civilian groups which we believe to be constitutionally subject to trial by a court- ██ martial, we consider first the provision contained in Article 2(7) of the Code, supra. In Kahn v Anderson, 255 US 1, 41 S Ct 224, 65 L ed 469 (1921), cited in the Toth case, supra, the United States Supreme Court upheld the conviction by court-martial of certain prisoners who had been, or were about to be, dishonorably discharged from the Army. The trial took place in this country, in time of peace, under authority conferred by a predecessor statute to Article 2(7), supra. It was argued that they were no longer members of the Army, but the Supreme Court held they were not entitled to be tried by a jury. This is what it said:

". . . even if their discharge as soldiers had resulted from the previous sentences which they were serving, it would be here immaterial, since, as they remained military prisoners, they were for that reason subject to military law and trial by

court-martial for offenses committed during such imprisonment.

. . . . .

"And as the authorities just referred to and the principles upon which they rest adequately demonstrate the unsubstantial character of the contention that to give effect to the power thus long established and recognized would be repugnant to the Fifth Amendment, we deem it unnecessary to notice the question further.

"In connection with this subject we observe that a further contention that, conceding the accused to have been subject to military law, they could not be tried by a military court because Congress was without power to so provide consistently with the guaranties as to jury trial and presentment or indictment by grand jury, respectively secured by article I, § 8 of the Constitution, and article 5 of the Amendments, is also without foundation, since it directly denies the existence of a power in Congress exerted from the beginning, and disregards the numerous decisions of this court by which its exercise has been sustained—a situation which was so obvious more than 40 years ago as to lead the court to say in Ex parte Reed, 100 U. S. 13, 21 (25 L. Ed. 538) :

'The constitutionality of the acts of Congress touching Army and Navy courts-martial in this country, if there could ever have been a doubt about it, is no longer an open question in this court. Const. art. I, § 8, and Amendment 5. In Dynes v Hoover, 20 How. 65, the subject was fully considered and their validity affirmed.' "

Even though part of the language we quote may not have been necessary to that decision, we have no reason to believe that the Supreme Court will disavow the principles proclaimed in that opinion. Certainly it has shown no disposition to do so at the present time, for the Court has very recently declined to review a case involving jurisdiction under Article 2 (7), supra. Lee v Swope, 24 LW 3186, cert denied February 27, 1956. If it does not later cast aside its own chosen words, persons who have been dishonorably separated from the service, but are still in the hands of the military for the purpose of serving a term of confinement, are subject to court-martial jurisdiction.

V

A second class of civilians is covered by Article 2 (10) of the Code which provides that, in time of war, all persons serving with or accompanying an armed force in the field are amenable to trial by military tribunals. The principle expounded in that provision is as old as history. We can, without difficulty, follow the history of civilian camp followers and sutlers as far back as the early part of the Sixteenth Century. During the reign of Maximilian I, of the Holy Roman Empire, 1493–1519, the province of Swabia formed mercenary armies which were rented out to, and fought for, the Holy Roman Empire. Every regiment of that Force was accompanied in the field by a number of followers, and though by the strict letter of the regulations only lawful wives were allowed to accompany soldiers, other women followed the colors. They performed the duties of washing, cooking, and the tasks of nursing the sick and wounded. Maintaining discipline over the force, including the civilians, was the responsibility of the military commander. 1 Fortescue, History of the British Army (1899), page 89.

Skipping over the years, we find civilians with the American and British Revolutionary Forces. The British apparently had foreseen such a state of affairs, for the British Articles of War of 1765 provided as follows:

"SECTION XIV. ART. XXIII. All Suttlers and Retainers to a Camp, and all persons whatsoever serving with Our Armies in the Field, though no inlisted Soldiers, are to be subject to orders, according to the Rules and Discipline of War."

A cursory sketch of the events of that time can be gathered from these recorded incidents. On June 30, 1775,

General Artemas Ward, the first Commander-in-Chief of the American Armed Forces, issued an order relative to the punishment of women infesting the camp He ordered that proper measures be taken by the military to bring civilians to punishment and many military orders authorizing the presence of women on the ration rosters were issued. General Washington, in the midst of his trials at Valley Forge, and while civilian processes were available, stated that women of the camp follower description should be either turned out of camp or arrested for trial and punishment. (Writings of Washington, Vol X, page 421). Blumenthal, in his work, Women Camp Followers of the American Revolution, 1952, page 72, notes that Washington issued twenty-five orders on civilians and that the camp women were recognized as a necessary part of the armed forces. The Commissary to the British Army in America on May 17, 1777, rendered a daily victual report for the British troops which included 23,601 men, 2,776 women, and 1,904 children. (Wier-Robinson Corres Penna Historical Society, Dreer Coll MSS, pages 8 to 10.) The same manuscript contained similar reports relative to the composition of forces in Rhode Island and Philadelphia. Again, according to Blumenthal, the Hessian General Von Wurmb complained, "the fact is that this corps has more women and children than men, which causes considerable vexation," and it is interesting to note that the widows and orphans of slain soldiers remained subject to military control. On July 3, 1777, General Burgoyne ordered commanding officers to assemble sutlers and women of the regiments and inform them that persons found guilty of disobedience were to have their liquors and sutling stores destroyed and to be turned out of camp "besides receiving such corporal punishment as a court-martial shall inflict." Burgoyne's Orderly Book, edited at Albany, 1860, page 24.

The foregoing extracts from the military past are sufficient to establish quite clearly that our founding fathers knew and expected that things would be as they always had been, i.e., that sutlers,

retainers to the camp, and all persons serving with the armies in the field would be subject to military jurisdiction. That knowledge was recognized in all American military codes, both before and after the adoption of the Constitution.

The present Article has come down to us, with only minor changes, from the American Articles of 1775. Winthrop, on page 98 of his Military Law and Precedents, 2d ed, 1920 Reprint, furnishes us with a valuable history and comment. Before quoting from his work, we might add, parenthetically, that he suggests no reservation as to the right of military courts in time of war to try persons in this category. These are his comments:

"1. UNDER ART. 63. This Article, which is the most important and comprehensive of the statutes indicated, provides as follows: — 'All retainers to the camp, and all persons serving with the armies of the United States in the field, though not enlisted soldiers, are to be subject to orders, according to the rules and discipline of war.' This provision, which, with some slight modifications, has come down from our original code of 1775, which derived it from a corresponding British article, has always been interpreted as subjecting the descriptions of persons specified, not only to the orders made for the government and discipline of the command to which they may be attached, but also to trial by court-martial for violations of the military code. Protected as they are by the military arm, they owe to it the correlative obligation of obedience; and a due consideration for the morale and discipline of the troops, and for the security of the government against the consequences of unauthorized dealing and communication with the enemy, requires that these persons shall be governed much as are those with whom they are commorant. Owing indeed to the policy of our laws relating to the army, which has aimed to impress, in general, a distinctive military character—as officers and enlisted men—upon the persons employed in the military service

proper, the classes of *attachés* mentioned in the Article have been less varied and numerous in our armies than in those of foreign nations. In our late war, however, they were necessarily more considerable than at any previous period."

The "corresponding British article" referred to by Winthrop in the quotation set forth above has been identified in Davis, A Treatise on the Military Law of the United States, 2d ed, 1903, page 478, as an article in the "British Code of 1774." General Davis speaks of that Code as follows (page 340):

"The British Articles of War, although they remained substantially unchanged in matters essential to discipline, were frequently modified in respect to details; and new editions were issued from time to time, especially during the last half of the eighteenth century. . . . In evidence of this seven sets of Articles were issued between the years 1766 and 1775. Of these the Articles of 1774 were probably those from which our own Articles of 1775 and 1776 were obtained."

General Davis buttresses this conclusion with a comparative study of these articles, by way of footnote, and concludes (page 341):

"Our Articles of 1775 correspond more nearly with the British Articles of 1774 than with the Massachusetts Articles.

"John Adams, the chairman of the Committee of Congress charged with the preparation of the Articles of 1776, remarks in his autobigraphy [sic], under date of August 13, 1776, when the draft of the proposed Articles were submitted to Congress: 'The British Articles of War were accordingly reported and discussed in Congress by me, assisted by some others, and finally carried. They laid the foundation of a discipline which in time brought our troops to a capacity of contending with British veterans and a rivalry with the best troops of France.' John Adams, Life and Autobiography, vol. iii. pp. 68, 69."

In the light of the British Articles of War, the early American Articles of War, and the comments of those most intimately concerned with the drafting of our Constitution, we conclude the framers of that historic document were well aware of the then existing military law. In granting Congress the power to make laws for the land and naval service, they must have intended to permit Congress to enact into military law those provisions which made civilians accompanying or serving with military forces in the field subject to trial by courts-martial. Those patriots who were the architects of our Constitution knew all too well the consequences that might flow from lack of control over the camp follower and the sutler, and they could not have intended to deny the military the power to try them for their transgressions. Although the constitutionality of this statute and its many predecessors has often been challenged in Federal civilian courts, the attack has never been successful. Ex parte Gerlach, 247 Fed 616 (SD NY) (1917); Ex parte Falls, 251 Fed 415 (D NJ) (1918); Ex parte Jochen, 257 Fed 200 (SD Tex) (1919); McCune v Kilpatrick, 53 F Supp 80 (ED Va) (1943); Grewe v France, 75 F Supp 433 (ED Wis) (1948).

As indicated by the Code, there are two essential ingredients which must be present before the civilian in this category is subject to trial by courts-martial. The service must be in the field in time of war. The phrase "in time of war," must be construed to refer to the actualities of the situation, rather than the presence of a formal declaration to that effect by Congress, United States v Bancroft, 3 USCMA 3, 11 CMR 3, and authorities cited therein, or the mere cessation of hostilities, Kahn v Anderson, supra. The phrase "in the field" has been taken to imply military operations with a view to an enemy, 14 Op Atty Gen 22 (1872), and the question of whether an armed force is "in the field" is determined by the activity in which it may be engaged at any particular time, not by the locality where it is found. Hines v Mikell, 259

Fed 28, 34 (CA 4th Cir) (1919), cert denied 250 US 645, 39 S Ct 494, 63 L ed 1187. In most instances, therefore, petitioners charged under this section, in seeking to escape the effect of their misconduct, have attempted to support their contentions that the court-martial lacked jurisdiction over them by asserting that, as a factual matter, they were not "accompanying" or "serving with" the armed forces. Hines v Mikell, supra; McCune v Kilpatrick, supra; In re Di Bartolo, 50 F Supp 929 (SD NY) (1943); In re Berue, 54 F Supp 252 (SD Ohio) (1944); Perlstein v United States, 151 F2d 167 (CA 3d Cir) (1945), cert dism'd 328 US 822, 66 S Ct 1358, 90 L ed 1602; Grewe v France, supra; Ex parte Weitz, 256 Fed 58 (D Mass) (1919). While we have been unable to find a square holding by the United States Supreme Court supporting military jurisdiction over this category of persons, many of the lower Federal court holdings set forth above were cited, apparently with approval, in Duncan v Kahanamoku, 327 US 304, 313, 66 S Ct 606, 90 L ed 688 (1946).

Finally, an accused may be regarded as "accompanying" or "serving with" an armed force, even though he is not directly employed by such a force or the Government, but, instead, works for a contractor engaged on a military project, or serves on a merchant ship carrying war supplies or troops. The test is whether he has moved with a military operation and whether his presence with the armed force was not merely incidental, but directly connected with, or dependent upon, the activities of the armed force or its personnel. McCune v Kilpatrick, supra; Perlstein v United States, supra; In re Di Bartolo, supra; In re Berue, supra; United States v Robertson, 5 USCMA 806, 814, 19 CMR 102.

In the present case, the accused worked directly for the benefit of the Air Force, he was supervised by Air Force personnel, he was quartered and messed on a military installation by military personnel, and he was accorded privileges normally granted only to military personnel. The operational success of that military command depended upon civilians such as this accused, and each of the services has found it necessary to rely on civilian technicians to repair and maintain the highly specialized signal and radar equipment now being used. The same type of services are performed, and substantially the same duties and obligations exist, between the individual and the service, regardless of whether he is an employee of the Government, or whether he is paid by an intervening contractor. Therefore, we are sure that this accused stands on the same footing as would any civilian employed directly by an armed force in an overseas area.

Putting aside the authorities and military customs existing from time immemorial and discussed above, there is a sound core of logic underlying the principle that, in time of conflict, persons serving with or accompanying the armed forces, whether within or without the United States and its territories, must be subject to control by the services and to trial by court-martial. Those persons move with and often support combat troops. They may perform laborious tasks, technical maintenance work, administrative duties, or logistical functions, and failure on their part to perform their duty may be disastrous. In addition, they acquire much valuable information and they may be a fertile source of valuable intelligence data for the enemy. They receive benefits and protection from the military arm while performing their tasks, and their efforts are essential to the accomplishment of the military mission. The security of the nation may depend on their activities, and they should answer to their immediate protector for any transgressions. They need not volunteer for the service, but once they do, they willingly place themselves in an assignment where the success or failure of the mission of the particular armed force may be governed by their conduct, behavior, and strict compliance with orders. It is just as necessary that they be governed by the demands of the military situation as the very troops they serve. Even a premature disclosure of their presence in an area

may awaken an enemy to the presence of American combat troops. It is not too much, then, to demand obedience to military law from them, and to conclude that they must be subject to the provisions of the Code, albeit they are civilians who—when tried by a military court—are denied a trial by jury.

## VI

We come then to the question of the constitutional validity of Article 2(11), supra, which governs this case and which provides for court-martial jurisdiction over civilians who, in time of peace, serve with, work for, or accompany the armed forces outside the territorial limits of the United States and its possessions. This is the area we have referred to earlier as not fully explored; but as we unfold our development, we hope to show a well-established rule by the Supreme Court to the effect that Congress can confer on military courts jurisdiction over this class of citizens without offending against the Constitution.

It may well be that we give more credence to the following statement than was intended by the author, but Mr. Justice Black, speaking for the Supreme Court in Duncan v Kahanamoku, supra, stated:

"... Our question does not involve the well-established power of the military to exercise jurisdiction over members of the armed forces, *those directly connected with such forces,* or enemy belligerents, prisoners of war, or others charged with violating the laws of war." [Emphasis supplied.]

If it were not for the problem of oversimplification, we might be content to say that our question is answered, because we are here dealing with the power of the military to exercise jurisdiction over a person who was, judged by appropriate standards, "directly connected" with the armed forces. However, we prefer to pass by the generalization and begin this part of our discussion with the premise set forth in Toth, supra, that this country should restrict military tribunals to the narrowest jurisdiction deemed essential to the maintenance of discipline among troops in active service. Regardless of how rigidly we construe that premise, we find much to support our conclusion that improper deportment on the part of civilians overseas, who are directly connected with the services, has an adverse impact on both discipline and its closely allied military intangible, morale, and ultimately on the success of the mission. We will later discuss in greater detail the issue of the demands and necessities of the service for authority to try civilians, but for the moment we pass further argument on that subject, and proceed directly to those precedents which we believe support a holding that Congress constitutionally may pass laws establishing military courts which are not manned and operated in the fashion of civil courts. We also conclude that it can render members of the civilian component who are overseas with an armed force amenable to its jurisdiction for trial of a criminal offense.

We consider it of some importance to mention that the provisions presently found in both Article 2(10) and (11) of the Uniform Code were taken, without material change, from Article of War 2(d), 10 USC, 1946 ed, § 1473, which provided for military jurisdiction over:

"All retainers to the camp and all persons accompanying or serving with the armies of the United States without the territorial jurisdiction of the United States, and in time of war all such retainers and persons accompanying or serving with the armies of the United States in the field, both within and without the territorial jurisdiction of the United States, though not otherwise subject to these articles. . . ."

Prior to 1916, only the jurisdiction now provided by Article 2(10) of the Uniform Code was part of the Articles of War. In that year, however, the 64th Congress revised the Articles of War, 39 Stat 650, and added the provision which became a part of 10 USC § 1473 and is now Article 2(11). The following extract from Senate Report No. 130, 64th Congress, 1st Session, page 30 et seq., sheds considerable light on the intent of Congress at that time:

**789**

"Subhead (d) of article 2, which corresponds to article 63 of the existing code, introduces the words 'All persons accompanying,' so as to make subject to the article a class of persons who do not fall under the designations, 'retainers to the camp,' and 'persons serving with the armies in the field,' employed in the existing law, and additional words are introduced so as to confer jurisdiction over all three classes of persons, to wit, (a) retainers, (b) persons accompanying, and (c) persons serving with the armies of the United States in the field, in time of peace, whenever the Army is serving outside the territorial jurisdiction of the United States. At present jurisdiction is limited to classes (a) and (c) and to a period of war. The purpose is to give full disciplinary authority over these three classes of persons when the army may be in peaceful transit through a foreign country, or where, as in Cuba in 1906, there is intervention in a foreign country falling short of war.

. . . . o .

"We now come to subhead (d), and here there is a change in the law which will claim your attention. In the present condition of our Articles of War 'retainers to the camp' (i.e., officers' servants, newspaper correspondents, telegraph operators, etc.), and 'persons serving with the armies in the field' (i.e., civilian clerks teamsters, laborers, interpreters, guides, contract surgeons, officials and employees of the provost marshal general's department, officers and men employed on transports, etc.) are made subject to the Articles of War only during the period and pendency of war and while in the theater of military operations. A number of persons who manage to accompany the Army, not in the capacity of retainers or of persons serving therewith, are not included. They constitute a class whose subjection to the Articles of War is quite as necessary as in the case of the two classes expressly mentioned. Accordingly the article has been expanded to include also persons accompanying the Army. The existing articles are further defective in that they do not permit the disciplining of these three classes of camp followers in time of peace in places to which the civil jurisdiction of the United States does not extend and where it is contrary to international policy to subject such persons to the local jurisdiction, or where, for other reasons, the law of the local jurisdiction is not applicable, thus leaving these classes practically without liability to punishment for their unlawful acts under such circumstances—as, for example, where our forces accompanied by such camp followers are permitted peaceful transit through Canadian, Mexican, or other foreign territory, or where such forces so accompanied are engaged in the nonhostile occupation of foreign territory, as was the case during the intervention of 1906–7 in Cuba." [Pages 30, 37, 38.]

Clearly, then, Congress intended to make just such a person as this accused subject to court-martial jurisdiction. This, we hold, was within its power unless the enactment contravenes the Fifth and Sixth Amendments to the Constitution, for it is clear, as was said in Skiriotes v Florida, 313 US 69, 61 S Ct 924, 85 L ed 1193 (1941), that:

". . . the United States is not debarred by any rule of international law from governing the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations or their nationals are not infringed. With respect to such an exercise of authority there is no question of international law, but solely of the purport of the municipal law which establishes the duty of the citizen in relation to his own government."

Article 5, Uniform Code of Military Justice, 50 USC § 555, permits the military service to govern the conduct of those persons in the military or those directly connected with it, in all places, foreign and domestic. This seems to us to make the Uniform Code more sweeping territorially than is the

Constitution, for the reasons which we will later develop. But if, throughout the world arena, a trial by jury must be made available to one who accompanies the armed services, the Code cannot be used as a vehicle to punish offenders who exert a profound influence on their brothers in arms, and every accompanying civilian will either go free or be tried by the host country. It takes little judicial acumen to know that indictments and jury trials cannot be furnished in foreign fields and, for reasons which we will later advance, trial upon return to American soil is impracticable.

It has been accepted as sound doctrine, during the last seventy years at least, that the Constitution is territorial in its application, and not personal. That is to say, the Constitution was established to govern the United States of America, and thus did not apply, *of its own force and in the absence of an act of Congress*, to the territorial possessions of the United States. Downes v Bidwell, 182 US 244, 257, 21 S Ct 770, 45 L ed 1088, 1095 (1901). Similarly, apart from specific exceptions created by Congress, the jurisdiction of the Federal district courts is territorial. Georgia v Pennsylvania R Co, 324 US 439, 65 S Ct 716, 89 L ed 1051 (1945). It follows that Congress need not deal with American citizens in foreign countries by enacting such a specific exception. In its discretion, Congress may, in the exercise of its powers, create legislative courts, such as consular courts, grant them a wide range of criminal jurisdiction, and not run afoul of any constitutional prohibition. Ex parte Bakelite Corp, 279 US 438, 49 S Ct 411, 73 L ed 789 (1929).

While only obliquely germane to our problem, it has been held by the Supreme Court that Congress may assume complete sovereignty over a territory, such as the Hawaiian Islands, yet not grant unto its citizens those rights and privileges of the Constitution providing for indictment by grand and trial by petit juries. Hawaii v Mankichi, 190 US 197, 220, 23 S Ct 787, 49 L ed 1016, 1024 (1903); see also Dorr v United States, 195 US 138, 24 S Ct 808, 49 L ed 128 (1904); and Balzac v Porto Rico, 258 US 298, 312, 42 S Ct 343, 66 L ed 627 (1922). This doctrine, which has inaccurately been described as the notion that the Constitution does not follow the flag, may be more precisely described as a group of decisions to this effect:

". . . so long as Congress had not 'incorporated' territory into the Union, neither military occupation nor cession by treaty make it domestic within the full operation of the constitutional guaranties, although there were doubtless some constitutional principles so fundamental as to go to the very root of the power of government." [Fairman, Some New Problems of the Constitution Following the Flag, 1 Stanford Law Review 587 (1949).]

The theory supporting the view that the Constitution is limited in its application to the United States and its incorporated territories is best expressed in the case of Ross v McIntyre, 140 US 453, 464, 11 S Ct 897, 35 L ed 581, 586 (1891). In that case, the defendant, while serving upon an American vessel which was anchored in the harbor at Yokohama, Japan, murdered the vessel's second mate. He was tried, convicted, and sentenced to be hanged by the American consular tribunal in Japan. The President commuted the sentence to life imprisonment, and while incarcerated in Albany Penitentiary, New York, the petitioner sought habeas corpus. In the face of a contention by the defendant that Congress could not constitutionally provide for a criminal trial before an American consul, and deny to the accused the benefits of indictment by grand, and trial by petit, jury, the Supreme Court replied:

". . . By the Constitution a government is ordained and established 'for the United States of America,' and not for countries outside of their limits. The guarantees it affords against accusation of capital or infamous crimes, except by indictment or presentment by a grand jury, and for an impartial trial by a jury when thus accused, apply only to citizens and others within the United

States, or who are brought there for trial for alleged offenses committed elsewhere, and not to residents or temporary sojourners abroad. Cook v. United States, 138 U.S. 157, 181 [34: 906, 912]. The Constitution can have no operation in another country. When, therefore, the representatives or officers of our government are permitted to exercise authority of any kind in another country, it must be on such conditions as the two countries may agree, the laws of neither one being obligatory upon the other. The deck of a private American vessel, it is true, is considered for many purposes constructively as territory of the United States; yet persons on board of such vessels, whether officers, sailors or passengers, cannot invoke the protection of the provisions referred to until brought within the actual territorial boundaries of the United States. And, besides, their enforcement abroad in numerous places, where it would be highly important to have consuls invested with judicial authority, would be impracticable from the impossibility of obtaining a competent grand or petit jury. The requirement of such a body to accuse and to try an offender would, in a majority of cases, cause an abandonment of all prosecution."

In the later case of Downes v Bidwell, supra, the Supreme Court reaffirmed the decision in Ross v McIntyre, supra, and phrased its holding in the following language (182 US 244, 270):

". . . [It is established] that the Constitution does not apply to foreign countries or to trials therein conducted, and that Congress may lawfully provide for such trials before consular tribunals, without the intervention of a grand or petit jury. . . ."

If we substitute the words "military courts-martial" for the words "consular tribunals" in the above quotation, we have the exact situation which Congress attempted to bring about by enacting Article 2(11) of the Uniform Code and its predecessor statutes. And how well the rationale of Ross v Mc-

**792**

Intyre, supra, to the effect that prosecutions will otherwise be abandoned, fits the military services operating overseas, may be illustrated without difficulty. The military services have been required to try civilians who were in foreign lands for a number of offenses of purely a local nature, such as murder, robbery, larceny, and extortion involving citizens of the host country. Our own judicial records and published opinions attest to that. Most assuredly, Congress could not enact a law which would guarantee a citizen who commits a crime of that type in a foreign country a grand jury presentment and a trial by Federal district court sitting either in the host or in this country. The rights of the host country cannot be disregarded, and while some reciprocal arrangement might be sought, it is extremely doubtful that the foreign sovereign would yield custody to this nation unless prosecution resulted before the offender left foreign shores.

Of course, in discussing the holding of the Ross case in Downes v Bidwell, the Supreme Court was speaking of consular tribunals and not courts-martial. But because the present military code is more beneficent than the laws of war, and the mode of procedure followed before military commissions, in that it insures to every accused person every constitutional right except a presentment by a grand jury and trial by petit jury—and as to those a time-honored substitute has been afforded—we are sure that our substitution is constitutionally permissible. An examination of more recent Supreme Court opinions supports us in our conclusion that both tribunals have jurisdiction to proceed.

In Madsen v Kinsella, 343 US 341, 72 S Ct 699, 96 L ed 988 (1952), the petitioner was the dependent wife of an Air Force lieutenant stationed in Germany. In October 1949, she shot and killed her husband at their residence in Buchschleg, Kreis Frankfurt, Germany. In February 1950, she was tried by the United States Court of the Allied High Commission for Germany, Fourth Judicial District, found guilty of murder, and sentenced to a term of confinement. The court was

composed of three judges, sitting without a jury. It should be remembered that the state of war and national emergency with respect to Germany was terminated July 25, 1947, by joint resolution of Congress, 61 Stat 449. Leading up to a holding that the court which tried the defendant had concurrent jurisdiction over her, the Supreme Court said (343 US 345):

> "*Both United States courts-martial, and United States Military Commissions or tribunals in the nature of such commissions, had jurisdiction in Germany in 1949–1950 to try persons in the status of petitioner on the charge against her.*—Petitioner does not here attack the merits of her conviction nor does she claim that any nonmilitary court of the United States or Germany had jurisdiction to try her. It is agreed by the parties to this proceeding that a regularly convened United States general court-martial would have had jurisdiction to try her. The United States, however, contends, and petitioner denies, that the United States Court of the Allied High Commission for Germany, which tried her, also had jurisdiction to do so. In other words, the United States contends that its courts-martial's jurisdiction was concurrent with that of its occupation courts, whereas petitioner contends that it was exclusive of that of its occupation courts."

Later in its opinion, the Supreme Court discussed the enlargement of court-martial jurisdiction enacted by Congress in 1916 and, without questioning its constitutionality, said (343 US 352, footnotes 18, 19):

> "[18] The 1916 Act substituted, for Article 63 (see note 15, supra), a new Article 12 which provided that '*General courts-martial shall have power to try any person subject to military law* for any crime or offense made punishable by these articles, and any other person who by the law of war is subject to trial by military tribunals: . . .' (Emphasis supplied.) 39 Stat. 652, 41 Stat. 789, 62 Stat. 629, 10 U.S.C. (Supp. IV) § 1483. A new Article 2 then defined

'*any person subject to military law*' so as to include—

> '(d) All retainers to the camp and *all persons accompanying or serving with the armies of the United States without the territorial jurisdiction of the United States,* and in time of war all such retainers and persons accompanying or serving with the armies of the United States in the field, both within and without the territorial jurisdiction of the United States, though not otherwise subject to these articles; . . .' (Emphasis supplied.) 39 Stat. 651, 41 Stat. 787, 10 U.S.C. § 1473 (d).

> "[19] In 1916, new Articles 92 and 93 expanded the jurisdiction of courts-martial over murder and certain other nonmilitary crimes so as to cover their commission by any 'person subject to military law.' *That phrase, through Article 2, included civilians in the status of petitioner.*" [Emphasis partially supplied.]

Thereafter the Court spoke as follows (343 US 355):

> ". . . The enlarged jurisdiction of the courts-martial therefore did not exclude the concurrent jurisdiction of military commissions and of tribunals in the nature of such commissions."

In assessing the significance of Madsen v Kinsella, supra, it is essential to bear in mind that court-martial jurisdiction cannot be conferred by consent of the accused. United States v Marker, 1 USCMA 393, 3 CMR 127; United States v Garcia, 5 USCMA 88, 17 CMR 88, and Federal authorities cited therein. Thus, even though the petitioner asserted that she was subject to trial by court-martial, a holding that there was no constitutional prohibition against such an exercise of jurisdiction was implicit in the Supreme Court's holding that the statute conferring courts-martial jurisdiction did not pre-empt the jurisdiction of the military commission. Otherwise, there would have been no necessity for considering either the question of pre-emption or of concurrent jurisdiction. But more important to this case is the express acknowledgment that the Government

may try American citizens overseas by either courts-martial or military commissions, neither of which is manned by a jury. We cannot believe that all members of the Supreme Court would fail to consider the question of whether the conviction was obtained in violation of the Fifth and Sixth Amendments to the Constitution. Certainly in Re Yamishita, 327 US 1, 16, 66 S Ct 340, 90 L ed 499 (1946), constitutional rights were discussed, and there the Court was dealing with the rights of a noncitizen, after the fighting had ceased, even though a technical state of war still existed. Surely, if constitutional questions are considered for an alien, they would not pass unnoticed in a case such as Madsen, involving a citizen. If the constitutional privileges need not be extended in Germany when the American military leader, through the Executive, is in command in time of peace, it is difficult for us to find a good reason why they must be extended by Congress in Japan when our occupation is by virtue of a peace treaty with that foreign sovereignty. There was only one dissenter in Madsen v Kinsella, and that was Mr. Justice Black, who seems to imply that Congress could have created some form of court to try Mrs. Madsen in Germany. Here is his reason for not joining with the majority:

"The very first Article of the Constitution begins by saying that 'All legislative Powers herein granted shall be vested in a Congress' and no part of the Constitution contains a provision specifically authorizing the President to create courts to try American citizens. Whatever may be the scope of the President's power as Commander in Chief of the fighting armed forces, I think that if American citizens in present-day Germany are to be tried by the American Government, they should be tried under laws passed by Congress and in courts created by Congress under its constitutional authority."

Certainly, there is no intimation in that dissent that Congress would be constitutionally unable to do what Justice Black seems to advocate, and to us the au-thority granting to courts-martial the power to try overseas persons accompanying the Army in present-day Germany has part of its roots in the Constitutional provision granting to Congress the right to govern and regulate the land forces. Certainly, the grant of power to do that need not be so narrowly construed that offenders whose offenses have a direct bearing on the military services are untouchable.

It is impossible to escape the holding of Madsen v Kinsella, supra, by contending that the court-martial's jurisdiction in that case was the jurisdiction of a military commission—powers which are presently given to general courts-martial by Article 18 of the Uniform Code. See United States v Schultz, 1 USCMA 512, 4 CMR 104, as to Article of War 12, 10 USC § 1483, the predecessor statute. We will not enter into an extended discussion of that contention for we believe the Supreme Court has held that the laws of war are respected and capable of application only "so far as they do not conflict with the commands of Congress or the Constitution." Re Yamashita, supra, 327 US 1, at 16. Hence, in an ultimate sense, the authority of a military commission to proceed must spring from a constitutional source, just as must the jurisdiction of a court-martial. On habeas corpus, civil courts may inquire to determine whether "the Constitution and laws of the United States constitutionally enacted forbid . . . [a] trial by military commission," just as in the case of trial by court-martial. Ex parte Quirin, supra, 317 US 1, at 25. In addition, it is worthy of mention that in Madsen v Kinsella, the Supreme Court spoke of military commissions as "constitutionally recognized agencies" (343 US 341, 346), and of their judges as deriving their "constitutional authority" from the President as Commander-in-Chief of the armed forces (343 US 341, 358). Thus, if there is any constitutional prohibition forbidding the trial of civilians by military tribunals in peacetime, outside the territorial limits of the United States, it would operate in the same manner against both military courts-martial and military commissions. Whatever

privileges are conferred on a citizen in a foreign country, during peacetime, whether they spring from executive or legislative sources, ought to be measured by the same judicial standard.

The older case of Neely v Henkel, 180 US 109, 21 S Ct 302, 45 L ed 448 (1901), is impossible to understand unless the hypothesis is accepted that Madsen, supra, is sound law. On December 10, 1898, the United States and Spain signed a treaty of peace, terminating the Spanish-American War, and this treaty was ratified and proclaimed April 11, 1899. This nation undertook to occupy Cuba, and on January 1, 1899, Major General John R. Brooke, U. S. Army, pursuant to a designation by the President, entered upon his duties as military governor of that island. Shortly thereafter, General Brooke established military government courts, and on July 21, 1899, he promulgated laws governing postal affairs in Cuba. Between that date and May 1, 1900, the accused, a United States citizen serving as finance agent for the department of posts in Havana, Cuba, embezzled some $58,000 in postal funds. He then absconded and made his way to New York, where he was arrested and held for extradition, at the request of the military governor. Neely then sought habeas corpus, and having been denied the writ, carried the fight to the Supreme Court. The Supreme Court affirmed, and Mr. Justice Harlan, speaking for the Court, first noted (page 119) that the laws allegedly violated by Neely had been established by the military governor, and then held that Cuba constituted "foreign territory" for the purposes of the pertinent portions of the extradition statute, even though the United States was the sovereign in Cuba at the time. He then turned to the question of the constitutionality of the extradition statute, which provided for extradition from this country to any foreign country or territory occupied by or under the control of the United States, and said (pages 122–123):

"II. It is contended that the act of June 6th, 1900, is unconstitutional and void in that it does not secure to the accused, when surrendered to a foreign country for trial in its tribunals, all of the rights, privileges, and immunities that are guaranteed by the Constitution to persons charged with the commission in this country of crime against the United States. Allusion is here made to the provisions of the Federal Constitution relating to the writ of habeas corpus, bills of attainder, *ex post facto* laws, trial by jury for crimes, and generally to the fundamental guaranties of life, liberty, and property embodied in that instrument. The answer to this suggestion is that those provisions have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country.

"In connection with the above proposition, we are reminded of the fact that the appellant is a citizen of the United States. But such citizenship does not give him an immunity to commit crime in other countries, nor entitle him to demand, of right, a trial in any other mode than that allowed to its own people by the country whose laws he has violated and from whose justice he has fled. When an American citizen commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States. By the act in question the appellant cannot be extradited except upon the order of a judge of a court of the United States, and then only upon evidence establishing probable cause to believe him guilty of the offense charged; and when tried in the country to which he is sent, he is secured by the same act 'a fair and impartial trial,'—not necessarily a trial according to the mode prescribed by this country for crimes committed against its laws, but a trial according to the modes established in the country where the crime was committed, provided such trial be had without discrimination against the accused because of his American citizenship.

**795**

In the judgment of Congress these provisions were deemed adequate to the ends of justice in cases of persons committing crimes in a foreign country or territory 'occupied by or under the control of the United States,' and subsequently fleeing to this country. We cannot adjudge that Congress in this matter has abused its discretion, nor decline to enforce obedience to its will as expressed in the act of June 6th, 1900."

We have been able to find only one Circuit Court of Appeals case wherein the predecessor statute to Article 2(11) of the Uniform Code was considered. In United States v Handy, 176 F2d 491 (CA 5th Cir) (1949), the accused had been a civilian employee of the Army Post Exchange System in Frankfort-am-Main, Germany. On July 31, 1948, he was arrested and thereafter charged with a violation of the Articles of War. The sworn charges were served upon him shortly before December 9, 1948, and trial was scheduled to be held on that date. Pending trial, the accused had not been placed in confinement, but had merely been restricted to the limits of the city. He took advantage of this grant of comparative freedom of movement to escape and return to this country by air. He was arrested in Texas by military authorities, with a view to returning him to Germany to stand trial. In upholding the District Court's denial of his petition for habeas corpus, the Circuit Court assumed without question that jurisdiction under Article of War 2(d) had attached while the accused was in Germany, and that even though the war had officially ended, his subsequent flight to this country had not divested the military of its power to try the accused. The court necessarily must have concluded that the Constitution did not forbid the trial of the accused without a jury, despite his status as a civilian.

To avoid any suspicion that we are attempting to deny a person accompanying the armed service overseas all of the constitutional rights it is possible to give him, let us make ourselves clear.

**796**

Once a person is held to be subject to military law, and he is ■■■■■■ tried by a court-martial, every right and privilege guaranteed to any citizen by the Constitution is granted him by the Uniform Code of Military Justice, with the exception of a trial by jury and a presentment of a grand jury. Accordingly, for the purposes of this case, when we speak of the Constitution as not being applicable in every locale where Americans are found, we are expressing an opinion only as to those two Constitutional guaranties. What Congress may do in denying other rights is not before us—and probably never will be, as it is doubtful that military law will ever be changed so as to take from an accused those rights he presently enjoys. In that connection, it should be kept in mind that the present military code so resembles enlightened civilian criminal codes that the rights, privileges, and immunities granted in the military system are, so far as practicable, at least equal to those given in civilian law. If, therefore, military commissions, organized by a military governor, may try an Amercan citizen under the strict procedural and narrow substantive rules and regulations which have been prescribed in the orders creating them, it is most difficult for us to understand how the affording to a citizen overseas of a trial by court-martial denies any right to which he is entitled. On the contrary, Congress, by giving him an opportunity to be so tried, seems to us to have granted him a benefit, not to have denied him a privilege. Surely that was the theory upon which defense counsel proceeded in the Madsen case, supra.

With the limitation set forth in the preceding paragraph in hand, let us turn to the contention that certain other Supreme Court opinions, not mentioned herein at length until now, have had the effect of discrediting the rationale of such cases as Hawaii v Mankichi, supra; Downes v Bidwell, supra; and Ross v McIntyre, supra. We do not believe this to be the case, for reasons we will now discuss.

In United States v Flores, 289 US 137, 53 S Ct 580, 77 L ed 1086 (1933),

upon which appellant relies, the Supreme Court held that Section 2 of Article 3 of the Constitution grants to Congress the power to define and punish, in Federal district courts, crimes committed by Americans on American vessels, in foreign waters. While, at first blush, this case would seem to say that the Constitution must be given extraterritorial effect, the very words used by the Court refute that proposition. After first observing that the criminal jurisdiction of the United States is in general based on the territorial principle, the court continued:

". . . But that principle has never been thought to be applicable to a merchant vessel which, for purposes of the jurisdiction of the courts of the sovereignty whose flag it flies to punish crimes committed upon it, is deemed to be a part of the territory of that sovereignty, and not to lose that character when in navigable waters within the territorial limits of another sovereignty."

Furthermore, even if we were to grant that the Flores case, supra, holds that the Constitution may be given extraterritorial effect, the holding is of small comfort to the accused, for the case does not hold that Congress must give it that extraterritorial effect. And in the case of the Uniform Code, Congress did not choose to do so in certain areas.

Blackmer v United States, 284 US 421, 52 S Ct 252, 76 L ed 375 (1932), and United States v Bowman, 260 US 94, 43 S Ct 39, 67 L ed 149 (1922), are of no aid to the appellant here, for they hold that Congress may make United States citizens, resident in a foreign country, amenable to process issued by American courts, and punishable in the United States for offenses committed in foreign countries. But these cases do not hold that Congress is limited to providing trial by Federal district court for these citizens. Moreover, in those cases there was no alternate method of procedure available, for no American court, military or civilian, had jurisdiction or control over the individuals involved until they returned to the United States.

The case of Best v United States, 184 F2d 131, 138 (CA 1st Cir) (1950), would cause us more concern, saying, as it does, "that the protection of the Fourth Amendment extends to United States citizens in foreign countries under occupation by our armed forces," if it were not for the fact that the Circuit Court put forth this proposition as no more than assumption; that this language does no more than set down a rule of evidence applicable in that Circuit; and that the language seems to be contrary to that employed in the Supreme Court opinion in Madsen v Kinsella, supra.

Appellant replies that our development flies in the teeth of views firmly held by Colonel William Winthrop, the most widely esteemed author in military law, who said (Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 107): "a statute cannot be framed by which a civilian can lawfully be made amenable to the military jurisdiction in time of peace." But at the time (1896) when this author wrote, this country had never sent or maintained an armed force abroad in time of peace, unless the punitive expedition sent to deal with the Barbary pirates can be so regarded, and then we are sure any civilians present would have been considered as in the field. Moreover, it is very unlikely that Winthrop ever contemplated the question of the constitutionality of an enactment such as Article 2(11), supra, which has as its purpose the maintenance of law and order in overseas expeditionary forces composed of both military and civilian personnel. Had he done so, and persisted in his view, it would establish only that either he or this Court misunderstands the law in this field.

In the light of the quoted authorities, we encounter some difficulty in following the arguments of those who assert that the principles of Toth v Quarles, supra, go further than merely to hold that one who has severed all his relationships with the armed forces and has been returned to this country is not subject to trial by court-martial. Aside from our belief that the Supreme Court did not intend to sweep aside a

**797**

number of impressive precedents, we find much language in the opinion which supports a limited application of the principle enunciated.

First, the thrust of the majority opinion of the court strikes down Article 3 because it was an attempt to extend court-martial jurisdiction to persons not previously so amenable. Prior to the adoption of the Uniform Code, military law had been interpreted by the respective Judge Advocates General of the services—and their views were vindicated by the Supreme Court's holding in Hirschberg v Cooke, 336 US 210, 69 S Ct 530, 93 L ed 621 (1949) —to provide that a person honorably discharged from the service was not subject to prosecution in a military court for an offense committed prior to his separation. No such rule or principle prevailed in regard to camp retainers or persons accompanying the military forces outside the United States and its possessions at the time of the adoption of the Code. For Congress to name them as being within the scope of military law was not an extension of jurisdiction, but merely a reaffirmance of a pre-existing power.

Second, two eminent military authorities are relied on by the Supreme Court to support its holding of unconstitutionality, namely Colonel Winthrop and Major General Green, formerly The Judge Advocate General of the Army. The latter appeared before the Congressional Committees to oppose certain provisions of the proposed Uniform Code of Military Justice. Conceding that General Green expressed the opinion that Article 3, if enacted, would be unconstitutional, he did not express any doubt about the legality of the predecessor provisions of Article 2(10) and (11), and appears to have been of the opinion that the Articles of War asserting jurisdiction over civilians accompanying or serving with military forces overseas were on firm ground. As to Colonel Winthrop, as we have earlier seen, it is doubtful that he considered the question of civilians overseas.

Third, we believe the Court recog-

**798**

nized the principle that legislation on the subject of court-martial jurisdiction could be sustained if it was shown to be a reasonable and necessary exercise of the Congressional authority to make rules for the government and regulation of the land and naval forces. We find support for that principle in the following language from Toth:

"None of the other reasons suggested by the Government are sufficient to justify a broad construction of the constitutional grant of power to Congress to regulate the armed forces. That provision itself does not empower Congress to deprive people of trials under Bill of Rights safeguards, and we are not willing to hold that power to circumvent those safeguards should be inferred through the Necessary and Proper Clause. It is impossible to think that the discipline of the Army is going to be disrupted, its morale impaired, or its orderly processes disturbed, by giving ex-servicemen the benefit of a civilian court trial when they are actually civilians. And we are not impressed by the fact that some other countries which do not have our Bill of Rights indulge in the practice of subjecting civilians who were once soldiers to trials by courts-martial instead of trials by civilian courts."

Of course, we, too, are not impressed with the laws of other countries which conflict with our heritage of legal institutions, but, more to the point, today we find our very preservation as a nation inexorably intertwined with the maintenance of large overseas contingents, composed of both military and civilian personnel. These groups are so closely related, in all aspects of the venture, that discipline and success will be affected adversely if one segment of the force is free to operate outside the law and the other is restricted to obedience. And this has always been true of armed forces being trained for or held in readiness for combat.

We have no doubt that the early sutlers, camp followers, and persons accompanying the armed forces in the

field, by their conduct, behavior, manner of performing their work and their compliance or noncompliance with military orders, had a measurable impact on the discipline, morale, efficiency and success of the military force. Surely if that conclusion was not sound, early commanders would not have felt constrained to issue orders concerning their problems. In early times, it was found necessary to have all persons who were in the area of combat, contributing, directly or indirectly, to the success or downfall of the military mission, subject to the law of the commander. Even with the authority to control the civilian followers, the early commanders were plagued with difficulties in protecting them and in channeling their efforts to carry on in such a manner that they would not interfere with military operation. As previously shown, the military commander could try those classes of persons if they offended against military law. In our overseas commands, present-day commanders are faced with the same problems. Conceding we are not in a state of declared war, our foreign armies may be likened to the Army garrisons in the far west during the days of the Indian Wars. They must be prepared to fight at the drop of a bomb, and their state of readiness depends upon control over those who contribute to the success of their operations. Camp followers in those days were considered a necessary part of a military expedition, and the military and political leaders of this country have concluded that civilian technicians form a vital segment of our overseas operations. Furthermore, few thoughtful people would deny the morale effect of permitting dependents to accompany their men to foreign assignments, and this country spends a tremendous sum of money to make that possible. Overseas commanders must protect the civilians who work for them, and the dependents who follow the serviceman, and if a commander cannot control, to some extent, their day-to-day behavior, the discipline, morale, repute and success of the Service will be injured. We can well imagine the impact on the Service if those who accompany our troops overseas, and live their daily lives with the serviceman,

could ignore the rules and regulations of the force commander. He is required to feed, house, care for, and protect them, and yet they could pay his orders no heed. In addition, civilian employees working with the Service and the dependents of service people are viewed by foreign countries as part of the military community. While they are civilians, the military is, in part, measured by their habits and behavior. If they are lawless and commit crimes against the public, discredit is brought on the service. Furthermore, all classes forming part of an overseas contingent, should be entitled to equal treatment by the law, and one class should not be preferred over the other. If such a condition is permitted to exist, at the expense of the serviceman, military discipline will be impaired. If a wife can murder her soldier husband and escape prosecution, why is the converse not true? Both have sinned, and each has affected the service involved. In this cold war era, as in the Revolutionary period, when the military community is commingled with civilian employees and dependents, the discipline of each affects the other. Under any situation in foreign countries, to free those civilians who are necessarily a part of the military operation from the legal and moral restraint placed on the military personnel, would create disciplinary problems of serious proportions. History shows it happened in the colonial days, with the civilians subject to military law, and if it comes to pass that they are now exempted, we can expect the difficulties to increase.

This is not the best case to use for illustration, but it offers an example of how a civilian employee might ruin both the morale of the individual airman and discipline in the Service. In an almost incredibly thoughtless manner, this accused pointed what he knew to be a loaded weapon at a fellow-human being, and despite his victim's appeal to reason, pulled the trigger. Had the accused shifted his aim just a trifle, he could easily have killed Clark, instead of wounding him. At all events, assault with a dangerous weapon is a serious offense which, in the military,

carries a maximum sentence of three years. The victim was hospitalized at a military installation; the facts of such an incident as this would be common knowledge within the local military community; and the average airman would know that had such an act been done by a member of the armed services, he would immediately lose his liberty, and the issue of his guilt or innocence would be fairly and promptly resolved by a court-martial. If, then, he learns that his countryman who works beside him in a civilian capacity, and who is just as truly a part of the overseas task force, can commit a major offense and be free to roam, reasonably certain that the merits of the matter cannot be investigated by the only department of the Government available and equipped for that purpose, and know that prosecution, if ever, cannot be commenced until after almost interminable delays, the serviceman can only conclude that American justice is not equal for all. There is no rational basis for this discrimination, and a fixed belief in the minds of servicemen that the civilian component of an overseas force is free from restraint, while the serviceman is closely circumscribed, has an immediate, palpable, and adverse effect on discipline and morale.

Going from this case to areas far more damaging to the combat readiness of an overseas command, it is readily ascertainable that black market transactions, trafficking in habit-forming drugs, unlawful currency circulation, promotion of illicit sex relations, and a myriad of other crimes which may be perpetrated by persons closely connected with one of the services, could have a direct and forceful impact on the efficiency and discipline of the command. One need only view the volume of business transacted by military courts involving, for instance, the sale and use of narcotics in the Far East, to be shocked into a realization of the truth of the previous statement. If the Services have no power within their own system to punish that type of offender, then indeed overseas crime between civilians and military personnel will flourish and that amongst civilians will thrive unabated and untouched. A

few civilians plying an unlawful trade in military communities can, without fail, impair the discipline and combat readiness of a unit. At best, the detection and prosecution of crime is a difficult and time-consuming business, and we have grave doubts that, in faraway lands, the foreign governments will help the cause of a military commander by investigating the seller or user of habit-forming drugs, or assist him in deterring American civilians from stealing from their compatriots, or their Government, or from misusing its property.

Let us suppose, for the purpose of argument, that offenses by civilians in foreign lands would not simply be ignored, and that some sort of prosecution would be attempted. Having in mind that we are considering only overseas personnel, should we, of all judges, force any American citizen, civilian or military, into a foreign court? Consideration must be given to this matter, for if these civilians cannot be tried by American military courts under American standards, then the host country will, in many instances, take over the prosecution. Some discussion of that unpalatable alternative is in order.

On July 15, 1953, the United States Senate ratified the Agreement Regarding Status of Forces of Parties to the North Atlantic Treaty, 99 Cong Rec 8837–38 (July 15, 1953), TIAS 2846. Article VII of this Agreement, commonly known as the NATO Status of Forces Agreement, provides in part as follows (99 Cong Rec 8724, et seq, July 14, 1953):

"1. Subject to the provisions of this Article,

(a) the military authorities of the sending State shall have the right to exercise within the receiving State all criminal and disciplinary jurisdiction conferred on them by the law of the sending State over all persons subject to the military law of that State;

(b) the authorities of the receiving State shall have jurisdiction over the

members of a force or civilian component and their dependents with respect to offenses committed within the territory of the receiving State and punishable by the law of that State."

Other pertinent provisions are to the effect that the military authorities of the sending State have the primary right to exercise jurisdiction over a member of its forces or its civilian component whenever the offense is solely against its property or security, or solely against the person or property of another member of that force or a civilian component or dependent, or where the offense arises out of any act or omission done in the performance of official duty. Article VII, § 3(c), supra. It follows, therefore, that if United States civilians who accompany, serve with, or are employed by, the armed forces overseas are not subject to military law, they are subject only to the jurisdiction of the foreign State. At the very least, that nation is free to prosecute if the military jurisdiction is not to be exercised. Under those circumstances, it answers no useful end to speak of making punishable in United States Federal courts local offenses committed overseas by United States civilians. The receiving State simply need not, and undoubtedly will not, permit them to go beyond its territorial limits. Thus the worst fears of the opponents of the Treaty will be realized, 99 Cong Rec 4659 (May 7, 1953), 99 id at 8735 (July 14, 1953), and the basic premise of its proponents undermined. 99 Cong Rec 8762–8769 (July 14, 1953). As will be seen, much the same situation is presented by our relations with Japan.

On February 28, 1952, the United States and Japan entered into the Administrative Agreement Under Article III of the Security Treaty Between the United States of America and Japan, TIAS 2492, February 28, 1952, Article XVII of that Agreement provides, in pertinent part:

". . . the United States service courts and authorities shall have the right to exercise within Japan exclusive jurisdiction over all offenses which may be committed in Japan by members of the United States armed forces, the civilian component, and their dependents, excluding their dependents who have only Japanese nationality. Such jurisdiction may in any case be waived by the United States.

. . . . .

"The United States undertakes that the United States service courts and authorities shall be willing and able to try and, on conviction, to punish all offenses against the laws of Japan which members of the United States armed forces, civilian component, and their dependents may be alleged on sufficient evidence to have committed in Japan, and to investigate and deal appropriately with any alleged offense committed by members of the United States armed forces, the civilian component, and their dependents, which may be brought to their notice by Japanese authorities or which they may find to have taken place. The United States further undertakes to notify the Japanese authorities of the disposition made by United States service courts of all cases arising under this paragraph. The United States shall give sympathetic consideration to a request from Japanese authorities for a waiver of its jurisdiction in cases arising under this paragraph where the Japanese Government considers such waiver to be of particular importance. Upon such waiver, Japan may exercise its own jurisdiction."

Once again, it is clear that the parties intended the United States to have the primary right to exercise jurisdiction over United States civilians present with our armed forces in Japan. Similarly, trial by military tribunal was contemplated. Surely then, if the military authorities have no constitutional right to exercise this jurisdiction, trial will be had, for any major crime, in a Japanese court. True enough, the record does not establish that assault with a dangerous weapon is recognized as an offense by Japanese law. But we have no doubt that at least something similar could be found within its penal code. Moreover, expanding the rule

**801**

beyond this case, most of the offenses committed would find their way into Japanese courts as they no doubt would be of such a character as to offend against that nation's law. Trial in a foreign court, then, is the true alternative to court-martial jurisdiction.

The previous argument is no mere makeweight. It was the intent of founders of our Constitution to insure basic guarantees of due process to each citizen. Treaties are the law of the land as well as statutes, and surely Congress and the Executive have not done anything inconsistent with that intent by providing trial by military tribunal for civilians overseas, for Constitutional safeguards are far more likely to be extended to United States citizens in a trial by court-martial than in a trial in a foreign court. The courts of foreign sovereigns, especially in civil law countries, are bound to follow traditions which are foreign to American standards of due process of law. Far better it is for an American accused to be tried by American court-martial, where he is entitled to representation, liberal rules of evidence, a presumption of innocence, and thorough review, than to be brought before a French, or Japanese, or German, or Moroccan, or even English civil court. In addition, because we are a nation of civilian soldiers, sailors, and airmen, many of the persons who now serve as court-martial members are the self-same individuals who previously served on grand and petit juries, and their views of justice do not change with their garb.

We think we may safely assert that American citizens would prefer trial by an American court-martial to a proceeding in a foreign tribunal, if their wishes were to be given any consideration in the matter. Certainly that statement is true if any lesson can be drawn from the desires voiced by American servicemen overseas. In the Congressional Record, February 20, 1956, page A1552, we find the following:

"Congressman FRANK J. BECKER, New York, visited American servicemen imprisoned in foreign jails. He concluded that the protec-

tion of the United States Constitution has been taken away from these citizens serving us overseas by the Status of Forces Treaty. These are the GI's who have been tried and convicted in foreign courts and are now serving sentences in foreign prisons.

"Those imprisoned in France and England were visited. All the GI's in England said that they would have preferred to be tried by Army or Air Force court martial. They felt that they would have had a much fairer trial and would have preferred to have an American officer defend them, even if they would have received more severe penalties from United States authorities. This was the rule before the Status of Forces Treaty.

"In France, a man is guilty until proven innocent; under our Constitution a man is presumed innocent and must be proven guilty. All but one GI would have preferred the court martial to prosecution in the French courts. Their trials were conducted in French; in two cases the French lawyers could not speak English."

In disposing of this issue, we cannot fail to comment on one obstacle which renders impracticable the trial of Americans after their return to American soil, for offenses against foreign local law. If criminal law cannot be enforced expeditiously, it loses its deterrent effect. If it cannot be enforced at all, it fails entirely. Although American citizens domiciled or resident abroad are subject to subpoena by American civil courts, Blackmer v United States, supra, no one supposes that foreign witnesses residing in their native land are amenable to the process of United States courts. They cannot be compelled to appear and testify, and depositions, when they can be used, are of little, if any, value. Rule 15, Federal Rules of Criminal Procedure, 18 USC. An accused is usually at a disadvantage and the Government benefited if the prosecution of the crime can be held at a great distance from the point of commission. The founding fathers

must have believed in that concept, for in their efforts to protect an accused, they required that he should be tried by an impartial jury of the State and district wherein the crime was committed. If, as some people suggest, Congress could provide or has provided for prosecution at accused's point of return to this country, 18 USC § 3238, we feel secure in our belief that, in many instances, he would be without friends, witnesses, or counsel who could effectively assist him in collecting evidence. In other instances, the Government, in all probability, would be handicapped by the unavailability of witnesses. Of course, Congress could make offenses committed overseas by civilians punishable in Federal district courts, but such an enactment would have little practical utility. Must the Service transport the accused and all the witnesses back to the United States? Or, must the prosecution await the return of the military forces to this country? In this case, the accused could be returned to the United States by his employer or by the Government. Next, the victim and the other civilian eyewitness could probably be compelled, by subpoena, to give up their employment. Their way to the United States and return could be paid for them. And they could be compelled to testify against the accused. The Air Force could be required to relieve the five other witnesses from their assignments, transport them to the United States, and maintain them in readiness to testify. But surely such a system would entail tremendous expense, fantastic waste, cumbersome procedures, and interminable delay. More than that, such a scheme of operation would never be used, so long as the receiving nation stands ready to prosecute. The reader is referred to the facts of the case of United States v Smith, 5 USC MA 314, 17 CMR 314; see Krueger v Kinsella, supra. An indispensable witness to that prosecution for premeditated murder was a Japanese maid. Could her deposition be used by the Government? Not according to law. Rule 15, Federal Rules of Criminal Procedure, supra. Assuming that Japan would consent to a removal of the accused from its jurisdiction, is it seriously contended that the maid would be subject to the compulsory process of a local district court? Congress apparently gave consideration to many of the obstacles suggested above, and concluded it would be impracticable to require trial in the United States, for it provided another method of procedure which permits trial on foreign shores. We are sure it did not exceed its powers in so doing and that the Government is entitled to its verdict in this case.

When the problem is considered in all of its aspects, a holding in favor of jurisdiction is demanded by constitutional construction, Congressional amendment, and Supreme Court precedent. Accordingly, the decision of the board of review is affirmed.

QUINN, Chief Judge (concurring in the result):

At the outset, it is important to repeat what I said at the beginning of my dissenting opinion in ■■■■■■ United States v Sutton, 3 USCMA 220, 228, 11 CMR 220: "I have absolutely no doubt in my mind that accused persons in the military service of the Nation are entitled to the rights and privileges secured to all under the Constitution of the United States, unless excluded directly or by necessary implication, by the provisions of the Constitution itself." Consequently, in my opinion, there is no merit to the argument that the Constitution has no application outside the continental limits of the United States. The cases cited in support of that argument deal with the general question of the territorial application of the Constitution, Hawaii v Mankichi, 190 US 197, 23 S Ct 787, 47 L ed 1016; Downes v Bidwell, 182 US 244, 21 S Ct 770, 45 L ed 1088, or with the practical inapplicability of specific provisions of the Constitution to "residents or temporary sojourners abroad." Ross McIntyre, 140 US 453, 464, 11 S Ct 897, 35 L ed 581. Our armed forces are now stationed in 63 foreign countries, as part of our program of national defense and our effort to preserve the peace of the world. They are not there-

**803**

by deprived of their Constitutional rights and privileges. On the contrary, those Constitutional rights and privileges are a fundamental part of the military law. And the military law governs our armed forces whether they are within or without the continental limits of the United States.

As for nonmilitary persons, the United States generally follows the territorial principle of crime; that is, an act is normally punishable only if it has consequences within the physical limits of the United States or its possessions. There are exceptions, of course, as in the case of counterfeiting. 18 USC § 471. However, the United States also has the right, and the duty, to regulate the conduct of its citizens, and other persons for whom it vouches, when they are in foreign countries. Skiriotes v Florida, 313 US 69, 61 S Ct 924, 85 L ed 1193; Blackmer v United States, 284 US 421, 52 S Ct 252, 76 L ed 375; Ross v McIntyre, supra. In providing standards of conduct for nonmilitary persons outside the United States, Congress exercises its sovereign authority to govern their "conduct . . . in foreign countries when the rights of other nations or their nationals are not infringed." Skiriotes v Florida, supra, page 73. The NATO Status of Forces Agreement and the Administrative Agreement between the United States and Japan are concrete examples of our Government's recognition of its responsibility in this field. What, then, are the standards of conduct, and the enforcement procedures, that Congress can adopt for nonmilitary persons for whom this Government is responsible during the time they are in foreign countries? Certainly, it cannot adopt standards and procedures which are repugnant to the fundamental principles of American justice which "go to the very root of the power of government." Fairman, Some New Problems of the Constitution Following the Flag. 1 Stanford L Rev .587 (1949). This limitation on the Congressional power is implied in the opinion of the United States Court of Appeals for the First Circuit in Best v United States, 184 **804**

F2d 131 (1950). On the other hand, Congress is not limited to standards of conduct and enforcement procedures which the Constitution requires for persons within the country, but which, outside the country, are either impossible of accomplishment, or are so impracticable as to "in a majority of cases, cause an abandonment of all prosecution." Ross v McIntyre, supra, page 464.

Common sense and sound practice indicate that prescribed standards of conduct should be the same for the military as for those persons who, although not actually members of the military, are "part of the armed forces," Toth v Quarles, 350 US 11, 15, 76 S Ct 1, 100 L ed (Adv p 4), or are "directly connected with such forces," Duncan v Kahanamoku, 327 US 304, 313, 66 S Ct 606, 90 L ed 688. These same considerations also indicate that enforcement procedures should be the same for both groups. And that is exactly what Congress accomplished by Article 2(11) of the Uniform Code of Military Justice, 50 USC § 552.

Congress assured the nonmilitary personnel abroad of all the guarantees and rights of the United States Constitution except those of indictment by grand jury and trial by petit jury. The Constitution recognizes these exceptions as to military personnel, see my dissenting opinion in United States v Sutton, supra, p 228. Necessity justifies the exceptions as to nonmilitary persons beyond the continental limits of the United States. Thus, in Ross v McIntyre, supra, the United States Supreme Court pointed out the substantial impracticability of attempting to provide for indictment by a grand jury and trial by a petit jury of persons accused of crime in foreign countries. As to such persons Congress can constitutionally provide a different method for the initiation and prosecution of charges. Of course, Congress can establish a separate civilian court for the trial of nonmilitary persons abroad. However, constitutionally it is not required to do so. Again since such individuals are "directly connected" with the armed forces abroad, good sense

and sound practice indicate that they should be tried by court-martial. Under the circumstances, enlargement of courts-martial jurisdiction is not "at the expense of the normal and constitutionally preferable system of trial by jury." Toth v Quarles, supra, pages 22–23. On the contrary, it provides a practicable, effective, and economical method of affording a constitutionally fair and just trial to nonmilitary persons who constitute "part of the armed forces" abroad. In my opinion, therefore, Article 2(11) of the Uniform Code of Military Justice is constitutional, and the court-martial had the power to try and to punish the accused.