UNITED STATES, Appellee,

v

LOUIS B. VARNEY, Department of the Army Civilian,
GS–11, a person serving with, employed by, and
accompanying the Armed Forces of the
United States in Japan, Appellant

7 USCMA 163, 21 CMR 289

No. 7773

Decided June 15, 1956

*Captain John F. Christensen* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Stanley F. Flynn.*

*First Lieutenant Lewis W. Evans* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton, Captain Thomas J. Nichols* and *First Lieutenant William K. Davenport.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convicted the accused of several offenses in violation of the Uniform Code of Military Justice and sentenced him to confinement at hard labor for one year and a $10,000 fine, with provision for additional confinement if the fine was not paid. The convening authority modified the findings of guilty and the sentence, and otherwise affirmed. A board of review affirmed his action. We granted review to consider whether the court-martial had jurisdiction to try the accused and whether the evidence is sufficient to support the findings of guilty of specifications 1 and 2, Charge II.

From the commission of the offense to and including the trial, the accused, ▮ an American civilian, was employed by the United States Army in Japan. Under the express terms of Article 2 (11) of the Uniform Code of Military Justice, 50 USC § 552, he is subject to trial by court-martial. In United States v Burney, 6 USCMA 776, 21 CMR 98,

we upheld the constitutionality of the statute. Consequently, the court-martial had power to try and sentence the accused.

Charge II alleges a violation of Article 132, Uniform Code of Military Justice, 50 USC § 726. Specification 1 states that, on October 1, 1952, for the purpose of obtaining approval and payment of a rental allowance, the accused submitted to the Civilian Personnel Section, Central Command, a writing which he knew falsely represented that he was the "proposed lessee" and H. Susuki the "owner" of certain dwelling premises. Specification 2 alleges that on March 1, 1953, for the same purpose and at the same place, the accused submitted an instrument entitled "Lease" in which he knew he was falsely described as the "lessee" and Susuki as the "lessor" and "legal representative" of one Duval, the owner.

A Department of the Army civilian in Japan who is not assigned to Government living quarters is given a rental allowance for private accommodations.

**164**

The allowance is based upon the amount paid for rent, utilities, and, if necessary, the rental of household furniture. The initial allowance is predicated upon the rent established in a rental agreement which must be submitted to and approved by the appropriate military agency as part of the civilian's application for the allowance. If not included in the agreed rent, the amount for utilities is estimated by the agency. At six-month intervals, an audit is made of the rent receipts and the actual cost of the utilities. Within the limitations established for the various civilian grades, upward and downward adjustments are made if the actual expenditure exceeds the allowance. If the rent is increased and an increase in quarters allowance is desired, the application for the increase must be supported by a lease showing the new rent. An allowance for private accommodations is also given to civilians who purchase a home. This allowance is limited to ten per cent per year of the value of the house.

On October 1, 1952, the accused submitted an application for quarters allowance. The application was accompanied by a private rental agreement providing for a rent of $150 per month. In the agreement the accused was designated as the "proposed lessee" and H. Susuki as the "owner." Estimated utilities costs were added to the agreed rent and an allowance of $2,400 annually was approved. In March 1953, the accused applied for an increased allowance. He submitted a lease in support of the application. In the lease, the accused was the "lessee" and Susuki was described as the "lessor" and "legal representative of the owner"; the premises were represented as being "owned and operated by 'DUVAL' Room #423 Hotel Tokyo"; Susuki's address was the same. The new rent was $250 per month, including all utilities. Taxes were to be paid by the lessor. The application was approved, and subsequently the accused was paid at the rate of $3,200 per year, the maximum for his employment grade. However, in the succeeding six-month audit, the accused's rent receipts for the period showed only $150 as the rent paid.

Quarters allowance payments were suspended, and an investigation was initiated.

At the trial it was stipulated that the premises in issue were registered in the Japanese Land Office in the name of H. Susuki. The prosecution showed, however, that in early 1952, Mr. Yoshio Muramatsu was approached by a Mr. Komeda in regard to the purchase of some land by "an American." Muramatsu's property was zoned for agriculture and he could only sell a limited amount if the use was to be changed to residential. Accordingly, he referred Komeda to Hara, who had residential land. Varney then appeared. He inspected Hara's land and agreed to buy it.

In the negotiations for Hara's land, Muramatsu acted as "intermediary for Varney." He received a deposit from the accused to bind the purchase and he was asked by the accused to arrange for a meeting with Hara. Later, the accused, Komeda, Susuki, a lawyer, and Muramatsu met at Hara's house. Agreement was reached on a date for payment of the balance of the purchase price and the registration of the title. About this time, Mr. Kubota, who worked under the accused, overheard a conversation between the accused and Susuki. They were "talking about giving the house back to Mr. Susuki after ten years . . . until that time the houses would be what you call it registered in Susuki's name." Kubota was sent by the accused to the land registration office to obtain information on the procedure for registering the title.

On the date set for the closing of title, the accused and Susuki appeared with a lawyer at the land registration office. There, they met Muramatsu and Hara. The accused paid the balance due on the contract to Hara. The lawyer and Susuki asked that the title registration be made in Susuki's name. This was done.

About July 1952, construction was begun on the land in question. Blueprints for the four structures that were eventually erected had been prepared at the accused's request by Mr. Nishiyama, an architect working under the

accused at the Engineer Depot. The electrical wiring plan had been drawn by Mr. Sahara, who also worked at the Depot under the accused's supervision. On August 9, 1952, Susuki purportedly gave the accused a power of attorney "concerning the construction of 4 houses located at . . . during my absence due to travel in foreign countries." In the early Fall, construction on four houses had progressed to the point where "two [were] coming on, with the other two in foundation form." At that time, the accused asked Mr. Kunioka, who also worked at the Depot, to inspect the buildings. Kunioka advised him of "certain faults." Various materials used in the buildings, including electrical equipment, lumber, and boilers came from the Engineer Depot. The accused and military personnel under his supervision were seen at the site during "normal duty hours." At first, on the accused's request, Mr. Nishiyama "look[ed] after the construction" but then the accused "assumed that job and began giving orders."

When the first house was completed, the accused moved in. All the other houses were finished "soon after." In December 1952, the accused insured the four houses. He paid the premium, but had the policy issued in the name of Susuki as the owner. As soon as a house was completed, the accused rented it. He collected the rents and issued receipts in Susuki's name. In the succeeding years, he also arranged for the repair of the several houses, installed equipment, and provided furniture, which he and his wife bought in local shops. He also paid the real estate taxes on all the houses.

Testifying in his own behalf, the accused admitted his participation in substantially all the activities related by the prosecution witnesses. Although he acknowledged that it was "very unusual to go out and do that kind of work and not to get any return on it at all," he maintained that he was not the owner of his house. To explain his conduct, he testified that he found that he could not obtain adequate living quarters through normal channels. He thought that he might build a house but when he found out "how much money . . . [he] was allowed" he did not "especially want to build" himself. Thus, he went to his "very good friend," Duval. At his suggestion, Duval agreed to finance the construction of a house for him. He assured Duval that a house would "amortize itself . . . in probably two and a half to three years." He found some land but the owner would not partition it so Duval decided to buy the whole parcel. The accused maintained that Duval and Susuki were the co-owners of the property, and he personally had no interest in his house "in any way, shape, form, or fashion."

When the accused's house was in the process of construction, the accused was purportedly approached by a friend who requested him to build another. Since the friend offered to pay six months rent in advance, Duval decided to build the second house. Later, Duval concluded that it would be advantageous to build two more houses. At that point, the accused indicated to Duval that since he had not received "one penny" for his work on the two houses, he believed that he should be recompensed for supervising the additional construction. He was "glad" to work on his own home and the one for his friend without compensation, but the others were just "a little bit bigger." Thereupon, he and Duval entered into an agreement. The accused agreed to supervise the construction of the other houses, as well as that for his friend, and then manage all three for Duval. When the rent return on these three houses had paid for the cost of construction, the accused and Duval would each receive 50 per cent of the rent for ten years. At the end of the ten-year period, Susuki was to get the property. The accused did not know why Susuki was included in this agreement. But the land had been registered in Susuki's name because Duval was busy and could not attend to the administrative details incidental to obtaining clearances from the Japanese government officials.

In February 1953, the accused allegedly applied for permission to engage in private employment. He rep-

resented his proposed duties as the "management, maintenance and rent collection" of the four houses. The application noted that "These houses were originated by Mr. Frank J. Duval, a properly licensed foreign trader . . . and his associate in business, Mr. H. Susuki, a Japanese national."

Additionally, the accused testified that his conduct in regard to the three houses was strictly in compliance with his agreement with Duval. As far as his own premises were concerned, he was a tenant. Until August 1953, he paid his rent, and the other rents that he collected, directly to Duval. At that time, Duval authorized him to retain all the rents, including his own, for the repair and furnishing of the three houses for rental to civilian instead of military personnel, because the former were given a higher quarters allowance. However, the accused admitted that he never submitted an account to Duval or Susuki. At the time of trial, an account was in the process of preparation by the "biggest" accounting firm in Tokyo. As soon as it was finished it was to be turned over to Duval.

Questioned on cross-examination about the lease which he had submitted in March 1953, to support his application for increased allowance, the accused admitted that Susuki did not sign it. He testified he "may have signed" Susuki's name. He also thought that the signature "looked very much like" his wife's handwriting. In any event, if he did sign the lease, he was authorized to do so by the power of attorney that he held. The accused further admitted that Susuki gave him signed blank rent receipts. The receipts submitted for the semiannual audit on the increased allowance were erroneous. They had been filled in incorrectly by his wife when he was on vacation.

Duval, Susuki and Komeda were not called as witnesses. Neither were any receipts for alleged payments to Duval produced. The accused testified that Duval was not in Japan, and his civilian defense counsel stated that a subpoena had not been issued for Duval because "it would have been too late at the time

that we realized that we needed his testimony." Susuki was "not available." No mention was made of Komeda as a witness, although it is intimated that he was still employed at the Depot.

At the outset, the accused contends that the law of the situs determines the nature of interests in ▪ real property. Since the prosecution presented no evidence as to the Japanese law regarding the landlord and tenant relationship, he maintains that the evidence is fatally insufficient to support the findings of guilty. We are not concerned, however, with Japanese law. The writings used by the accused were submitted to American military authorities for the purpose of obtaining approval and the payment of a rental allowance under applicable provisions of American law. Clearly, the accused intended that the words "lessor" and "lessee" would have their ordinary meaning under American law, without regard to any possibly different meaning that they might have under Japanese law. A writing must be construed in accordance with the plain intention of the parties and in the light of the purposes to be served. Hendrie v Lowmaster, 152 F2d 83 (CA6th Cir) (1945).

From several points of view, there is substantial evidence to support the court-martial's finding that ▪ the accused was not the lessee and Susuki was not the lessor of the premises. Although the title was registered in Susuki's name, the accused was vested with all the incidents of ownership. Of particular importance is the fact that he personally negotiated and paid for the land. See: 54 Am Jur, Trusts, § 203; United States v Comstock Extension Mining Co., 214 F2d 400 (CA9th Cir) (1954). Moreover, he handled the entire construction and paid for the materials; persons under his official supervision were engaged on the project at his request; he or his wife signed Susuki's name on the lease used to obtain an increased quarters allowance; Susuki gave him blank rent receipts; he paid the taxes, made all necessary

**167**

repairs, and furnished the houses. Under these circumstances, the court members could reasonably conclude that Susuki was merely the nominal owner, and the accused was the true owner.

Looking to the accused's account of the transaction, the court-martial could also reasonably conclude that his occupancy was that of an owner. Although the accused attempted to separate his house from the others and establish a mere employment relationship as to the latter, there is ample evidence to the contrary. He testified that he attempted to purchase only enough land on which to build a single house, but Muramatsu's testimony supports a finding that he agreed to purchase the entire parcel, without in any way attempting to obtain a lot sufficient for one house. Moreover, before any construction was begun, Kubota overheard the accused and Susuki discuss the ten-year agreement which, according to the accused, did not originate until Duval decided to build two more houses. It is significant, too, that in the declaration of intention to engage in private employment, the accused said that Duval and Susuki "originated" the houses; he did not say that they owned the property, which would have been the natural thing to say if they were the only owners. Alternatively, therefore, the court-martial could find that if the accused was not the sole owner at the time of the purported lease, he was, at least, a common owner with Duval, and that each had a 50 per cent interest in all four houses, for ten years, with an executory limitation over to Susuki. See Doing v Riley, 176 F2d 449 (CA 5th Cir) (1949). In short, the court-martial could reasonably find from the evidence that Susuki was not merely Duval's alter ego, but also the nominal holder of the title for the accused. Thus, Susuki was not the accused's lessor; nor was the accused Susuki's lessee. From either standpoint, therefore, the evidence establishes beyond a reasonable doubt the allegations of specifications 1 and 2 of Charge II.

The decision of the board of review is affirmed.

Judges LATIMER and FERGUSON concur.