Judge ERDMANN
delivered the opinion of the court.
Pursuant to his pleas, Mr. Alaa Mohammad Ali, a foreign national working as a civilian contractor in Iraq, was convicted by a military judge sitting as a general court-martial of making a false official statement, wrongful appropriation, and wrongfully endeavoring to impede an investigation, in violation of Articles 107, 121, and 134 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 907, 921, 934 (2006). Ali was sentenced to five months of confinement. In accordance with a pretrial agreement, the convening authority approved a sentence of time served. The United States Army Court of Criminal Appeals (CCA) affirmed the findings and only so much of the sentence as included 115 days of confinement and ordered that Ali be credited with 115 days of confinement credit to be applied against his sentence. United States v. Ali, 70 M.J. 514, 521 (A.Ct.Crim.App.2011).[1]
Prior to trial Ali filed a motion to dismiss, arguing that under the facts of this case Congress could not exercise military jurisdiction over him, but if the exercise was proper, the court-martial lacked jurisdiction under Article 2(a)(10), UCMJ. The military judge denied the motion holding that the congressional exercise of jurisdiction was constitutional and the court-martial had jurisdiction *259 pursuant to Article 2(a)(10), UCMJ.[2] After Ali’s conviction, his case was forwarded to the Army Judge Advocate General (JAG) for review under Article 69(a), UCMJ. The Army JAG subsequently forwarded Ali’s case to the CCA for review of the jurisdictional issues. Direction for Review, United States v. Ali, No. 20080559 (A.Ct.Crim.App. filed Mar. 31, 2010). The CCA affirmed the military judge’s jurisdictional determinations. Ali, 70 M. J. at 520.
We granted review to determine whether Ali falls within the scope of Article 2(a)(10) and, if so, whether this exercise of jurisdiction violates the Constitution.[3] We hold that Ali falls within the scope of Article 2(a)(10) and that the congressional exercise of jurisdiction, as applied to Ali, a non-United States citizen Iraqi national, subject to court-martial outside the United States during a contingency operation, does not violate the Constitution.

Background

I. Events Leading to the Charges Against Ali
Mr. Ali was born in Baghdad and is an Iraqi citizen. Ali fled Iraq in 1991 and ultimately settled in Canada where he obtained Canadian citizenship in 1996. Under both Canadian and Iraqi law, Ali retained his Iraqi citizenship. In December 2007, Ali entered into an independent contractor agreement with L3 Communications, an American company, to provide linguist services in Iraq under L3’s contract with the United States Army Intelligence and Security Command.[4] The contract stated that the work may take place in a combat zone or other dangerous environment but did not contain a provision notifying Ali that he was subject to the UCMJ.
After receiving predeployment training at Fort Benning, Georgia, Ali was assigned to serve as the interpreter for 1st Squad, 3rd Platoon, 170th Military Police Company, stationed in Hit, Iraq. 1st Squad was tasked with training and advising the Iraqi police in Hit. As an interpreter, Ali accompanied 1st Squad on its missions and served as the direct link between the squad and the Iraqi police officers. Ali wore the same clothing as the soldiers but was not issued a weapon. Initially Ali lived with the soldiers of 1st Squad but when the squad was moved to a different location, he lived with other interpreters serving with the 3rd Platoon. For administrative purposes Ali was supervised by the L3 Site Manager in Al Asad, Iraq, but for operational purposes he reported directly to Staff Sergeant Butler, squad leader for 1st Squad.
On February 23, 2008, Ali had a verbal altercation with another Iraqi interpreter, Mr. Al-Umarryi. During this altercation Al-Umarryi struck Ali in the back of the head with his fist. The incident was reported to Butler and while Ali was alone in Butler’s room waiting for the squad leader to return, he took a knife off Butler’s weapons belt without Butler’s permission or knowledge. Ali later had another confrontation with Al- *260 Umarryi which resulted in four cuts to Al-Umarryi’s chest and a bloody nose for Ali.
On February 23, Ali was placed on restricted liberty which prohibited him from leaving Victory Base Complex and required that he check in with L3 twice a day. L3 was aware of this restriction. Ali violated the restriction and traveled to Al Asad. He was then placed in pretrial confinement on February 29. On March 27, charges were preferred against Ali and on April 9, 2008, his employment was terminated by L3. On May 10, the charges were referred to a general court-martial and on May 24, 2008, Ali’s counsel filed a motion to dismiss for lack of jurisdiction.
II. Ruling of the Military Judge
In his ruling on Ali’s motion to dismiss, the military judge found that jurisdiction existed over Ali under Article 2(a)(10), which provides for UCMJ jurisdiction “[i]n time of declared war or contingency operation, [over] persons serving with or accompanying an armed force in the field.”[5]
In finding jurisdiction, the military judge held: Operation Iraqi Freedom (OIF) was a contingency operation as defined by Congress in 10 U.S.C. § 101(a)(13) (2006); Ali was a “person” as that term is used in the statute; Ali was “serving with or accompanying an armed force” because he “served as an interpreter on every mission the squad went on” and was an “integral” and “necessary part of the team;” and, Ali was serving “in the field” for purposes of Article 2(a)(10), because the area of Hit was an area of “actual fighting.”
In finding jurisdiction over Ali, the military judge focused on Ali’s status at the time of trial and again held that he was a person accompanying an armed force in the field during a contingency operation. Citing Perlstein v. United States, 151 F.2d 167, 169-70 (3d Cir.1945), the military judge rejected Ali’s argument that there was no jurisdiction because L3 had terminated his employment prior to the referral of charges holding that “[Ali’s] relationship with his civilian employer is not determinative.”[6]
The military judge also rejected Ali’s argument that the Government could not exercise jurisdiction because he was not on notice that he was subject to the UCMJ. The military judge held that while there was no requirement that Ali be notified that he was subject to the UCMJ, Ali had, in any event, been notified that he was subject to the UCMJ.[7]
After finding jurisdiction over Ali under the terms of Article 2(a)(10), UCMJ, the military judge went on to review “whether Congress has the power, under the United States Constitution, to extend military jurisdiction as far as it did to reach the accused.” The military judge held that the exercise of court-martial jurisdiction over Ali, “under the facts of this case,” was constitutional pursuant to art. 1, § 8, cl. 14 of the United States Constitution (granting Congress the authority “to make Rules for the Government and Regulation of the land and naval Forces”). Addressing Ali’s argument that he was denied his Fifth Amendment right to presentment or indictment of a grand jury, the military judge explained “[b]ecause this is a case arising in the land or naval forces, the Fifth Amendment explicitly states that the *261 accused has no such right at this court-martial.”
III. Ruling of the Army Court of Criminal Appeals
Following M’s conviction, the Army JAG sent M’s case to the CCA for review under Article 69, UCMJ. Before the CCA M argued that “Congress exceeded the scope of its legislative authority when it amended the UCMJ to extend court-martial jurisdiction to reach civilians during contingency operations and thereby deprived him of the due process protections of the Fifth and Sixth Amendments to the United States Constitution.” Ali 70 M.J. at 517.
The CCA first evaluated the statutory application of Article 2(a)(10) and agreed with the military judge that “appellant and his offenses fall squarely within the jurisdictional language of Article 2(a)(10).” Id. at 518.
In its constitutional analysis, the CCA found that Mticle 2(a)(10) was appropriately limited by the requirements that there must be a declared war or contingency operation and that the person must be serving with or accompanying the force in the field. Id. at 520.
These two requirements, when applied in conjunction with the temporal requirement that either a declared state of war or a contingency operation be in existence, ensure that the exercise of jurisdiction over civilians is “restricted” to the “narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service.”
Id. (quoting Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 240, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960)). Finding that the exercise of military jurisdiction over Ali was proper, the CCA found no violation of either the Fifth or Sixth Amendments. Id.

Discussion

In his appeal to this court, Ali renews his arguments that: (1) the exercise of UCMJ jurisdiction over him violated his Fifth and Sixth Amendment rights; and (2) he does not fall within the scope of the provisions of Mticle 2(a)(10). We will address these issues in reverse order as it is unnecessary to review the constitutional questions if Mi does not fall within the statutory scope of Article 2(a)(10). See Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932) (“When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.”).
I. UCMJ Jurisdiction
“Jurisdiction is the power of a court to try and determine a ease and to render a valid judgment. Jurisdiction ‘is a legal question which we review de novo.’” United States v. Harmon, 63 M.J. 98, 101 (C.A.A.F. 2006); United States v. Kuemmerle, 67 M.J. 141, 143 (C.A.A.F.2009). Generally, there are three prerequisites that must be met for courts-martial jurisdiction to vest: (1) jurisdiction over the offense, (2) jurisdiction over the accused, and (3) a properly convened and composed court-martial. See Rule for Courts-Martial (R.C.M.) 201(b); Harmon, 63 M.J. at 101. Only the first two of these requirements are at issue in this case.
A. Jurisdiction Over the Offense
“[G]eneral courts-martial have jurisdiction to try persons subject to this chapter for any offense made punishable by [the UCMJ].” Article 18, UCMJ, 10 U.S.C. § 818 (2006); R.C.M. 201(b)(5) (“The offense must be subject to court-martial jurisdiction.”). Additionally, the UCMJ “applies in all places.” Article 5, UCMJ, 10 U.S.C. § 805 (2006). Because Ali was charged with and convicted of misconduct punishable by Articles 107, 121, and 134 of the UCMJ, the court-martial had jurisdiction over the offenses.
The court-martial’s jurisdiction over the offense alone, however, is not sufficient to establish jurisdiction. Since 1987 it has been clear that an inquiry into court-martial jurisdiction focuses on the person’s status, i.e., whether the person is subject to the UCMJ at the time of the offense. Solorio v. United States, 483 U.S. 435, 107 S.Ct. 2924, 97 *262 L.Ed.2d 364 (1987).[8] Our inquiry into whether jurisdiction over the offense exists therefore requires an analysis of the criteria found in Article 2(a)(10); whether Appellant was subject to the UCMJ under its terms.
In its current form, Article 2(a)(10) reflects a long-standing principle that civilians serving alongside the military may be subject to courts-martial under the military justice system in some limited circumstances. Prior to the founding of this country, the British Articles of War of 1765 provided for jurisdiction over “[a]ll Suttlers and Retainers to a Camp, and all persons whatsoever serving with Our Armies in the Field.” British Articles of War of 1765, section XIV, art. XXIII, reprinted in William Winthrop, Military Law and Precedents 941 (2d ed., Government Printing Office 1920). The first American Articles of War enacted in 1775 included this language from the British Articles. American Articles of War of 1775, art. XXXII, reprinted in Winthrop, Military Law and Precedents at 956. The Articles retained that language with only minor modifications until enactment of the Uniform Code of Military Justice in 1950. See Winthrop, Military Law and Precedents at 98. When the UCMJ was enacted in 1950, under Article 2(10) courts-martial jurisdiction included, “[i]n time of war, all persons serving with or accompanying an armed force in the field.” Article 2(10), UCMJ (1950).
In 1970 this court held that the term “time of war” in Article 2(a)(10) referred only to a “war formally declared by Congress.” United States v. Averette, 19 C.M.A. 363, 365, 41 C.M.R. 363, 365 (1970). Since Congress had not formally declared war since World War II, the subsequent reach of Article 2(a)(10) was substantially reduced. However, in 2006 Congress amended the language of Article 2 in the 2007 National Defense Authorization Act to read “[i]n time of declared war or contingency operation,” effectively nullifying Averette. 2007 National Defense Authorization Act, Pub.L. No. 109-364, § 552, 120 Stat. 2217 (2006) (emphasis added).[9] Thus, in its current form Article 2(a)(10) provides jurisdiction “[i]n time of declared war or contingency operation, [over] persons serving with or accompanying an armed force in the field.” We address each of these statutory requirements in turn.[10]
1. “Contingency Operation”[11]
Neither Ali nor the Government contest the military judge’s finding that Operation Iraqi Freedom was a contingency operation as that term is defined in 10 U.S.C. § 101(a)(13) (2006).[12]
*263 2. “Serving With” or “Accompanying an Armed Force”
Ali argues that because the terms “serving with” and “accompanying” are not defined in Article 2(a)(10), the Manual for Courts-Martial, or case law, the terms are ambiguous. Ali suggests that this court look to the Military Extraterritorial Jurisdiction Act (MEJA) and the North Atlantic Treaty Organization Status of Forces Agreement (NATO SOFA) for the definition of those terms as each excludes nationals of the host country from its jurisdiction.[13] Ali goes on to urge this court to read into Article 2(a)(10) an exclusion of nationals of the host nation because “it is evident that [he] is a member of a class of persons that Congress intended to exclude from the definition of serving with or accompanying an armed force in the field.”
In response, the Government refers us to United States v. Burney, 6 C.M.A. 776, 788, 21 C.M.R. 98, 110 (1966),[14] where we addressed the phrase “persons serving with or accompanying an armed force.” In Burney, we stated that “[t]he test is whether [the accused] has moved with a military operation and whether his presence with the armed force was not merely incidental, but directly connected with, or dependent upon, the activities of the armed force or its personnel.” Id. We also noted that “an accused may be regarded as ‘accompanying’ or ‘serving with’ an armed force, even though he is not directly employed by such a force or the Government, but, instead, works for a contractor engaged on a military project.” Id.
Nothing suggests that Congress could not have placed the limitations against application to host-country nationals found in MEJA within Article 2(a)(10), and we find it unnecessary to rely on the definitions found in either MEJA or the NATO SOFA, particularly when we have previously addressed those terms as used in Article 2(a)(10) in the military context. Thus, we look to the facts of this case in light of prior precedent to determine whether Ali was “serving with” or “accompanying the force.” In his ruling on the motion to dismiss, the military judge found:
The accused was serving with 1st Squad, 3rd Platoon, 170th Military Police Company. He served as an interpreter on every mission the squad went on. Not only was he an integral part of the team, he was the necessary part of the team. Without the accused, or another interpreter, the squad could not perform the military mission it had in Operation Iraqi Freedom. He was the only member of the team that was necessary. Even the squad leader, SSG Butler, could be replaced by another Soldier taking charge, and the mission could be accomplished.
The military judge identified several other factors indicating that Ali was serving with the Army, including: he wore a tape stating “U.S. Army” and the unit patch for the 42nd Military Police Brigade on his uniform, as did the soldiers in his squad; he wore body armor and a helmet like the soldiers; he lived in a combat outpost, at first with other soldiers then with other interpreters; he received mission orders from the squad lead *264 er/team chief and reported for operational purposes to the squad leader/team chief; and when he had interpersonal conflicts he raised them with his military supervisors.
Additionally, the military judge found that Ali and the soldiers of 1st Squad faced daily threats from enemy insurgents operating in the area around Hit. The squad was routinely attacked with improvised explosive devices, vehicle-borne explosive devices, small arms fire, precision small arms fire, and indirect fire. As an interpreter, Ali would have been specifically targeted by the enemy in an attempt to inhibit United States Army communications capabilities. For operational purposes, Ali’s role as interpreter was integral to the mission of 1st Squad. He was virtually indistinguishable from the troops serving in 1st Squad and he faced the same daily routines and threats as they did.
We conclude that Ali was both “serving with or accompanying” the soldiers of 1st Squad at the time of the offense.
3. “In the Field”
Ali urges this court to narrowly construe the meaning of “in the field” under Article 2(a)(10) in light of the Supreme Court precedent limiting military jurisdiction over civilians. Ali argues that the term “in the field” must be narrowly construed so as to require both (1) a contingency operation; and (2) the practical unavailability of a civilian criminal forum. The Government responds by noting that Colonel Winthrop broadly defined the phrase to mean “the period and pendency of war and to acts committed in the theater of war.” The Government goes on to rely on the discussion in Burney in which this court stated that “in the field” means in an area of actual fighting. Burney, 6 C.M.A. at 787-88, 21 C.M.R. at 109-10.
Although the Supreme Court in Reid v. Covert analyzed the provisions of Article 2(11), the Court did distinguish and discuss the “in the field” requirement of then Article 2(10):[15]
Experts on military law, the Judge Advocate General and the Attorney General have repeatedly taken the position that “in the field” means in an area of actual fighting ....
Article 2(10) of the UCMJ, 50 U.S.C. § 552(10), provides that in time of war persons serving with or accompanying the armed forces in the field are subject to court-martial and military law. We believe that Art. 2(10) sets forth the maximum historically recognized extent of military jurisdiction over civilians under the concept of “in the field.”
354 U.S. 1, 34 n. 61, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (citations omitted).
We see no reason not to adopt this interpretation of “in the field,” which requires an area of actual fighting, for our analysis of Article 2(a)(10). Cf. Burney, 6 C.M.A. at 787-88, 21 C.M.R. at 109-10. Ali and 1st Squad were living at a combat outpost and conducting their missions in and around Hit, where they faced attacks from enemy insurgents on a daily basis. The military judge found that a typical mission required “mission preparations, safety brief, accountability, convoy to the mission site in up-armored HMMWVs, training of Iraqi Police ... [and] conducting] patrols with the Iraqi police.” There is little doubt that 1st Squad was in an area of actual fighting and thus, “in the field.”
We therefore agree with the military judge and the CCA that Ali was serving with or accompanying an armed force in the field during a contingency operation. The misconduct is punishable by Articles 107, 121, and 134, UCMJ, 10 U.S.C. §§ 907, 921, 934 (2006), and jurisdiction existed under Article 2(a)(10).
B. Jurisdiction over the Person
Tost-Solorio, the status of the individual is the focus for determining both jurisdiction over the offense and jurisdiction over the person. See Harmon, 63 M.J. at 101 (“military jurisdiction over the person continues as long as military status exists”); United States v. Murphy, 50 M.J. 4, 7 (C.A.A.F. 1998) (citing Solorio for the proposition that *265 “the test for whether a military court-martial has jurisdiction to try an accused is the military status of the accused”). The only difference is that jurisdiction over the person depends on the person’s status as a “person subject to the Code” both at the time of the offense and at the time of trial. Compare Solorio, 483 U.S. at 451, 107 S.Ct. 2924, with United States v. Howard, 20 M.J. 353, 354 (C.M.A.1985) (“It is black letter law that in personam jurisdiction over a military person is lost upon his discharge from the service, absent some saving circumstance or statutory authorization.”).
Having agreed with the military judge that Ali was a person subject to the Code under Article 2(a)(10) at the time of the offense, we now must determine whether there was something that altered his status between the time of the offense and the time of trial. Ali argues that he no longer fell within Article 2(a)(10) at the time of trial because L3 fired him prior to his arraignment and he was no longer serving with or accompanying the force. The Government responds that it is clear that Ali was serving with and accompanying the force both at the time of the assault and at the time of trial and therefore the court-martial had jurisdiction.
We need not determine whether the termination of Ali’s employment by L3 also terminated his status of “serving with” the force, as the facts demonstrate that he was still “accompanying the force.” As noted in the analysis of R.C.M. 202(a):
Although a person “accompanying an armed force” may be “serving with” it as well, the distinction is important because even though a civilian’s contract with the Government ended before the commission of an offense, and hence the person is no longer “serving with” an armed force, jurisdiction may remain on the ground that the person is “accompanying an armed force” because of continued connection with the military.[16]
Manual for Courts-Martial, United States, Analysis of the Rules for Courts-Martial app. 21 at A21-11 to A21-12 (2008 ed.) (MCM). Thus, regardless of whether Ali continued to “serve with” an armed force after his civilian employment termination, he certainly continued to accompany the force while awaiting trial.[17] See Perlstein, 151 F.2d at 169 (holding that the jurisdictional question was not the defendant’s employment status but whether he was still accompanying the Army at the time of the offenses); In re Di Bartolo, 50 F.Supp. 929, 931 (S.D.N.Y.1943) (critical issue for purposes of jurisdiction was not whether accused had been terminated by government contractor at the time of court-martial, rather “[t]he primary issue is whether the petitioner accompanied the Armies of the United States”).
Accordingly, we find the court-martial had jurisdiction over Ali. Having held that the court-martial had jurisdiction over Ali under the provisions of Article 2(a)(10), we turn to whether the exercise of that jurisdiction over Ali violated the Constitution.
II. Whether Congress’s Exercise of Jurisdiction in Article 2(a) (10) Violates the Constitution
Ali’s primary argument is that Article 2(a)(10) is unconstitutional as applied in this case because he was not afforded the protections of the Fifth and Sixth Amendments. The constitutionality of an act of Congress is a question of law that we review de novo. United States v. Disney, 62 M.J. 46, 48 (C.A.A.F.2005). Where, as here, an appellant argues that a statute is “unconstitutional as applied,”[18] we conduct a fact-specific inquiry. See Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 289, 42 S.Ct. 106, 66 L.Ed. 239 (1921) (“A statute may be invalid as applied to one state of facts and *266 yet valid as applied to another”) (citations omitted); Disney, 62 M.J. at 50-51 (determining, based on the facts of the case, that the statute at issue was “constitutional as applied to [a]ppellant’s conduct”); United States v. Marcum, 60 M.J. 198, 206-08 (C.A.A.F.2004) (viewing the case as a “discrete criminal conviction based on a discrete set of facts” and determining that Article 125, UCMJ, 10 U.S.C. § 925 (2006), was “constitutional as applied to [a]ppellant”).
To succeed in his as-applied challenge, Ali must show that he was entitled to Fifth and Sixth Amendment protections and that, under the facts of this case, these protections were violated when he was subjected to military jurisdiction. See United States v. Salerno, 481 U.S. 739, 745 & n. 3, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (describing the “heavy burden” required to assert a facial challenge and noting how the appellant did not argue that the legislative act was “unconstitutional because of the way it was applied to the particular facts of their case”).
A. Fifth and Sixth Amendment Protections
Ali alleges that exercise of court-martial jurisdiction violated his rights under the Fifth and Sixth Amendments, citing the line of Supreme Court cases denying court-martial jurisdiction over civilians.[19] He argues those cases demonstrate the Supreme Court’s unwillingness to expand military jurisdiction to include civilians and urges the court to apply the same framework in this case, thereby rejecting an overly broad reading of Article 2(a)(10). Ali highlights the Supreme Court’s concern, reflected in Covert, 354 U.S. at 37, 77 S.Ct. 1222, that courts-martial do not provide an accused the same protections as civil courts, specifically “trial by jury before an independent judge after an indictment by a grand jury.”
Unlike Ali, the defendant in Covert was a United States citizen, and the Supreme Court’s concern reflected the impermissible denial of constitutional protections to “an American citizen when [she] was tried by the American Government in [a] foreign land[] for offenses committed there.” 354 U.S. at 5, 77 S.Ct. 1222. Indeed, all of the cases relied upon by Ali for the constitutional limitations on congressional extension of military jurisdiction over civilians involved United States citizens tried by court-martial not in a time of war. None of these cases purported to address the issue before us, which is the constitutionality of military jurisdiction over a noncitizen tried outside of the United States during a contingency operation. Under the circumstances of this case, the concerns raised by the Supreme Court are not applicable.
However, we must first consider whether Ali, a foreign national being tried outside the United States for a crime committed outside the United States, enjoys the protections of the Fifth and Sixth Amendments which the Supreme Court was concerned with in Covert and the cases cited in note 19, supra. This threshold determination is critical to our analysis as Ali’s primary constitutional argument relies on his assertion that he is in a position like that of the individuals the Supreme Court determined could not be subjected to military jurisdiction, see supra note 19, because he too is entitled to Fifth and Sixth Amendment protections.
In his brief and at oral argument Ali relied on United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), for the principle that he was entitled to fundamental due process rights under the *267 Constitution because he was subjected to the judicial power of the United States. Verdu-go-Urquidez was a Mexican citizen who was arrested for various drug offenses in Mexico on a United States arrest warrant. Id. at 262, 110 S.Ct. 1056. He was later tried in a United States district court where he claimed that the search of his residence in Mexico by United States law enforcement violated his Fourth Amendment rights. Id. at 263, 110 S.Ct. 1056. The Supreme Court held that the Fourth Amendment did not apply where the search of a nonresident alien’s home occurred in a foreign country. Id. at 261, 110 S.Ct. 1056. While recognizing that the Supreme Court did not extend Fourth Amendment protections to Verdugo-Urquidez, Ali argues that since he was subjected to the judicial power of the United States, he was entitled to fundamental due process rights.
While Verdugo-Urquidez referenced several cases discussing constitutional protections applicable to aliens,[20] it also explained that “[tjhese cases ... establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country.” Id. at 271, 110 S.Ct. 1056 (emphasis added). While there is no case law extending constitutional protections granted by the Fifth and Sixth Amendments to noncitizens who are tried overseas there is precedent to the contrary. See, e.g., Johnson v. Eisentrager, 339 U.S. 763, 783, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (rejecting the principle “that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses”); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (“Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens.”).
In holding that the Fourth Amendment was not applicable to a United States Government search of a home owned by a nonresident alien located outside the United States, Verdugo-Urquidez reiterated these principles in its discussion of Eisentrager, which is instructive as to the constitutional rights afforded to noncitizens outside the United States. In disposing of the Fourth Amendment claims which were raised in Ver-dugo-Urquidez, the Supreme Court discussed the Fifth Amendment claims that were raised in Eisentrager:
Indeed, we have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States. In Johnson v. Eisen-trager, the Court held that enemy aliens arrested in China and imprisoned in Germany after World War II could not obtain writs of habeas corpus in our federal courts on the ground that their convictions for war crimes had violated the Fifth Amendment and other constitutional provisions. The Eisentrager opinion acknowledged that in some eases constitutional provisions extend beyond the citizenry; “the alien ... has been accorded a generous and ascending scale of rights as he increases his identity with our society.” But our rejection of extraterritorial application of the Fifth Amendment was emphatic:
“Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. None of the learned commentators on our Constitution has even hinted at it. *268 The practice of every modern government is opposed to it.”
If such is true of the Fifth Amendment, which speaks in the relatively universal term of “person,” it would seem even more true with respect to the Fourth Amendment, which applies only to “the people.”
Verdugo-Urquidez, 494 U.S. at 269, 110 S.Ct. 1056 (citations omitted).
At its core, Ali’s argument suggests that regardless of that fact that he is a nonresident who is not a citizen of the United States and regardless of where the offense took place or where he was tried, so long as he is subjected to judicial processes of the United States, the Fifth and Sixth Amendments apply because he is a “person” who stands “accused,” and is being tried by the United States.[21] Once again, Eisentrager is instructive:
We have pointed out that the privilege of litigation has been extended to aliens, whether friendly or enemy, only because permitting their presence in the country implied protection. No such basis can be invoked here, for these prisoners at no relevant time were within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of any court of the United States.
339 U.S. at 777-78, 70 S.Ct. 936 (emphasis added). Ali’s case is similar. The offenses giving rise to the charges against Ali took place outside the United States.
To be sure, the Supreme Court held well before its decision in Eisentrager, that:
all persons within the territory of the United States are entitled to the protection guarantied by [the Fifth and Sixth] amendments, and that even aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law.
Wong Wing, 163 U.S. at 238, 16 S.Ct. 977. Those protections, however, are the result of the alien’s presence “within the territory” of the United States. Id.
Moreover, the Supreme Court has evaluated the question of whether noncitizens are afforded the protections of the Fifth and Sixth Amendments and has reasoned that aliens outside the United States are not guaranteed those rights. See, e.g., Curtiss-Wright, 299 U.S. at 318, 57 S.Ct. 216; Balzac v. Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922) (one of “The Insular Cases,” holding Sixth Amendment right to jury trial inapplicable in Puerto Rico); Ocampo v. United States, 234 U.S. 91, 34 S.Ct. 712, 58 L.Ed. 1231 (1914) (Fifth Amendment grand jury provision inapplicable in the Philippines); Dorr v. United States, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904) (jury trial provision inapplicable in the Philippines). Thus we find no precedent, and the parties have not provided any law, which mandates granting a noncitizen Fifth and Sixth Amendment rights when they have not “come within the territory of the United States and developed substantial connections with this country.” Verdugo-Urquidez, 494 U.S. at 271, 110 S.Ct. 1056. Neither Ali’s brief prede-ployment training at Fort Benning, Georgia,[22] nor his employment with a United States corporation outside the United States constitutes a “substantial connection” with the United States as envisioned in Verdugo-Urquidez. Ultimately, we are unwilling to extend constitutional protections granted by the Fifth and Sixth Amendments to a nonciti-zen who is neither present within the sovereign territory of the United States nor has established any substantial connections to the United States. Whatever rights Appellant had were met through the court-martial process.[23]
*269 We are mindful of the Supreme Court’s repeated refusals to extend court-martial jurisdiction over civilians and recognize the high court’s repeated caution against the application of military jurisdiction over anyone other than forces serving in active duty. Covert, 354 U.S. at 40, 77 S.Ct. 1222 (“We should not break faith with this nation’s tradition of keeping military power subservient to civilian authority, a tradition which we believe is firmly embodied in the Constitution.”); Toth, 350 U.S. at 22, 76 S.Ct. 1 (“There are dangers lurking in military trials which were sought to be avoided by the Bill of Rights and Article III of our Constitution.”). However, those cases are factually distinguishable because the defendants in those cases were United States citizens who indisputably enjoyed the protections of the Fifth and Sixth Amendments.[24] See Covert, 354 U.S. at 32, 77 S.Ct. 1222 (noting that like the defendant in Toth, the defendants were American citizens).[25]
Ali’s claim that the application of Article 2(a)(10) to him violated the Constitution under the circumstances of this case fails.[26]
B. Necessary and Proper Clause
Citing Covert, Ali’s second argument is that the Necessary and Proper Clause, U.S. Const, art. I, § 8, cl. 18, cannot be used to extend Congress’s power to authorize court-martial jurisdiction over civilians under art. I, § 8, cl. 14 because the term “land and naval Forces” refers only to members of the armed forces.
As an initial matter, Congress has the power to “declare War” and to “make Rules for the Government and Regulation of the land and naval Forces.” U.S. Const, art. I, § 8, cls. 11, 14. These powers are separate and distinct sources of constitutional authority for congressional action. See Solorio, 483 U.S. at 441, 107 S.Ct. 2924. Moreover, we recognize that “the Necessary and Proper Clause cannot extend the scope of Clause 14.” Covert, 354 U.S. at 21, 77 S.Ct. 1222. In this case we find the Government’s argument that Article 2(10) was based on clause 14 and that Ali was a member of the “land and naval Forces” unpersuasive, but this is of no moment. The Supreme Court has cited Congress’s “war powers” as the constitutional source of authority and justification for federal court decisions which “upheld military trial of civilians performing services for the armed forces ‘in the field’ during time of war.”[27] Covert, 354 U.S. at *270 33, 77 S.Ct. 1222 (“To the extent that these cases can be justified, insofar as they involved trial of persons who were not ‘members’ of the armed forces, they must rest on the Government’s ‘war powers.’ ” (citing Perlstein, 151 F.2d 167; Hines v. Mikell, 259 F. 28 (4th Cir.1919)); Ex parte Jochen, 257 F. 200 (S.D.Tex.1919); Ex parte Falls, 251 F. 415 (D.N.J.1918); Ex parte Gerlach, 247 F. 616 (S.D.N.Y.1917); Shilman v. United States, 73 F.Supp. 648 (D.C.N.Y.1947), rev’d in part, 164 F.2d 649 (2d Cir.1947); In re Berue, 54 F.Supp. 252 (S.D.Ohio 1944); McCune v. Kilpatrick, 53 F.Supp. 80 (E.D.Va.1943); In re Di Bartolo, 50 F.Supp. 929 (S.D.N.Y.1943)).
C. Reasonable Availability of Article III Forum
In the alternative, the Amici Navy-Marine Corps and Air Force Appellate Divisions argue that in Toth and Singleton the Supreme Court held that “if Congress reasonably could provide an Article III forum for the trial of civilians accompanying the military overseas, a court-martial is unconstitutional.” Amici also argue that the “availability” of a civilian court is merely a question of logistics and that military authorities could have transported Ali back to the United States for trial in an Article III court. (Citing Toth, 350 U.S. at 23, 76 S.Ct. 1 (suggesting that Congress use the “least possible power adequate to the end proposed”)). In other words, court-martial jurisdiction over civilians is unnecessary when there are “available alternatives” which guarantee constitutional protections.
Leaving aside the fact that MEJA expressly provides for concurrent jurisdiction with courts-martial, the problem this argument presents is that no Article III alternative exists under the facts of this case. While MEJA extends to civilians “employed by or accompanying the Armed Forces,” 18 U.S.C. § 3261(a) (2006), which likely includes non-United States citizens, cf. United States v. Brehm, No. 1:11-cr-11, 2011 U.S. Dist. LEXIS 33903, at *3, 2011 WL 1226088, at *1 (E.D.Va. Mar. 30, 2011) (finding that MEJA extended to a South African civilian contractor who worked for the Department of Defense in Afghanistan), it does not extend to citizens of the host nation. See 18 U.S.C. § 3267(1)(C), (2)(C) (excepting all “national[s] of or [those] ordinarily resident in the host nation”). Thus, there is no available alternative forum here, and Congress used the “least possible power adequate” to try Ali in this case. Toth, 350 U.S. at 23, 76 S.Ct. 1.[28]
III. Fosler/Ballan Issue
Charge III and its specification alleged a violation of Article 134, UCMJ, specifically that Ali “[d]id, at or near Combat Outpost 4, Iraq, o/a 23 Feb 08, wrongfully endeavor to impede an investigation in the case of himself and H.A.U. by wrongfully hiding evidence, to wit: the knife which injured H.A.U.” The specification did not contain reference to the terminal elements of clauses 1 or 2 of Article 134, prejudice to good order or discipline or service discrediting conduct.
Ali pled guilty to Charge III. The stipulation of fact, signed by Ali, stated that “Mr. Ali’s conduct was prejudicial to good order and discipline in that it impeded the Soldiers of the 170th MP Company in their efforts to determine the facts of the physical altercation, the reasons for the fight and the means of Mr. AlUmarryi’s injuries.” During the providence inquiry, the military judge explained the elements of prejudice to good order and discipline and service discrediting conduct to Ali. Ali stated that his conduct was prejudicial to good order and discipline. Ali’s case is factually analogous to United States v. Ballan, 71 M.J. 28 (C.A.A.F.2012). Ballan pled guilty to an Article 134 charge which omitted the terminal element, entered into a pretrial agreement, submitted a stipulation of fact which addressed the terminal *271 element, and indicated that he understood the nature of the prohibited conduct during the providence inquiry. Id. at 30-35. This court applied a plain error review and found no material prejudice to Ballan’s substantial rights. Id. Similarly, we find no material prejudice to Ali’s substantial rights in light of the error in Charge III.

Decision

The decision of the United States Army Criminal Court of Appeals is affirmed.

. Oral argument was held at the University of Washington School of Law, Seattle, Washington, as part of the court's "Project Outreach.” See United States v. Mahoney, 58 M.J. 346, 347 n. 1 (C.A.A.F.2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

. Following the denial of his motion to dismiss, Ali filed a petition for extraordinary relief with the CCA, which the CCA denied. Ali v. Austin, Army Misc. Dkt. No. 20080678 (A.Ct.Crim.App. 2008). Ali then filed a writ-appeal petition with this court which was also denied. Ali v. Austin, 67 M.J. 186 (C.A.A.F.2008) (summary disposition).

. We granted review of the following issues:
I. Whether the military judge erred in ruling that the court had jurisdiction to try Appellant and thereby violated the due process clause of the Fifth and Sixth Amendments by refusing to dismiss the charges and specifications.
II. Whether the court-martial had jurisdiction over Appellant pursuant to Article 2(a)(10), Uniform Code of Military Justice.
III.Whether an Article 134 clause 1 or 2 specification that fails to expressly allege either potential terminal element states an offense under the Supreme Court's holdings in United States v. Resendiz-Ponce and Russell v. United States, and this Court’s Opinion in United States v. Fosler, 70 M.J. 225 (C.A.A.F. 2011).
United States v. Ali, 70 MJ. 418 (C.A.A.F.2011) (order granting review).

. Ali’s employment contract was with L3 Communications (L3), however, in his Army Letter of Identification and Authorizations, the organization is identified as "Titan Corporation.” Ali’s employer is referred to as “L3,” "Titan,” "L3 Titan,” and "L3/Titan Corporation” in the record. All references in this opinion are to L3.

. Article 2, UCMJ, enumerates individuals who are subject to court-martial under the UCMJ.

. In Perlstein, the United States Court of Appeals for the Third Circuit affirmed the lower court's finding that the court-martial had jurisdiction over the accused, a civilian contractor working for the Army in Africa who was alleged to have stolen jewelry after being terminated but before departing Africa. The court explained that "it is not Perlstein’s employment status ... that furnishes the test of the court martial’s [sic] jurisdiction over him.” 151 F.2d at 169.

.The military judge found that Ali attended a predeployment briefing at Fort Benning where he was notified that he would be subject to the UCMJ. While Ali disputes this finding of fact, we accept the military judge’s factual finding on this point as it is supported by record testimony indicating that Ali signed in at the briefing immediately following. See United States v. Melanson, 53 M.J. 1, 2 (C.A.A.F.2000) ("When an accused contests personal jurisdiction on appeal, we review that question of law de novo, accepting the military judge’s findings of historical facts unless they are clearly erroneous or unsupported in the record.”).

. Solorio overruled O’Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), in which the Supreme Court held that court-martial jurisdiction depended on the "service connection” of the offense charged. Solorio, 483 U.S. at 436, 107 S.Ct. 2924. In Sobrio, the Supreme Court returned to its earlier precedent: “[i]n an unbroken line of decisions from 1866 to 1960, this Court interpreted the Constitution as conditioning the proper exercise of court-martial jurisdiction over an offense on one factor: the military status of the accused.” Id. at 439, 107 S.Ct. 2924.

. Unfortunately there is virtually no legislative history in the Congressional Record that explains the congressional intent for including the amended language.

. In his ruling, the military judge evaluated the "four” elements of Article 2(a)(10), including "persons” and found "Congress' use of the broad term 'persons’ encompasses the accused, who is a citizen of Iraq and a citizen of Canada.” The parties do not dispute the application of the term "persons” to Ali.

. Although Ali does not argue that Operation Iraqi Freedom was not a contingency operation, he suggests that the statutory definition of contingency operation is overly broad and thus there is a risk that Article 2(a)(10) could be applied to civilians in a wide variety of circumstances.

. 10 U.S.C. § 101 (a)(l 3) defines contingency operation as:
[A] military operation that — (A) is designated by the Secretary of Defense as an operation in which members of the armed forces are or may become involved in military actions, operations, or hostilities against an enemy of the United States or against an opposing military force; or (B) results in the call or order to, or retention on, active duty of members of the uniformed services under section 688, 12301(a), 12302, 12304, 12304a, 12305, or 12406 of this title, chapter 15 of this title, or any other provision of law during a war or during a national emergency declared by the President or Congress.

. MEJA is applicable to civilian employees “employed by the Armed Forces” which includes employees of a Department of Defense or other qualifying federal agency contractor who are outside the United States in connection with their employment and who are not a national or ordinary resident of the host nation. 18 U.S.C. § 3267(1) (2006). MEJA limits the phrase "accompanying the Armed Forces” to dependents of military members, civilian employees of the Department of Defense, or Department of Defense contractors. 18 U.S.C. § 3267(2) (2006). The NATO SOFA defines "civilian component” as "the civilian personnel accompanying a force of a Contracting Party who are in the employ of an armed service of that Contracting Party, and who are not stateless persons, nor nationals of any state which is not a Party to the North Atlantic Treaty, nor nationals of, nor ordinarily resident in, the State in which the force is located.” Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces, art. I, ¶ 1(b), June 19, 1951, 4 U.S.T. 1792, 199 U.N.T.S. 67.

. The defendant in Burney was a civilian employed by a government contractor stationed at an Air Force base in Japan when he was tried by court-martial for assault with a deadly weapon in violation of Article 128, UCMJ. Id. at 781-82. The Court of Military Appeals held that the exercise of court-martial jurisdiction was constitutional. Id. at 803.

. Article 2(10) was the predecessor to today’s Article 2(a)(10).

. MCM explanations of offenses are not binding on this court, but are generally treated as persuasive authority. United States v. Miller, 67 M.J. 87, 89 (C.A.A.F.2008).

. The fact that Ali’s continued accompaniment was not voluntary is irrelevant for our analysis as his confinement was a direct result of his actions in violating his restriction to Victory Base Complex.

.Counsel for Ali asserted that his constitutional challenge was "as applied” at oral argument.

. United States ex rel. Toth v. Quarles, 350 U.S. 11, 23, 76 S.Ct 1, 100 L.Ed. 8 (1955) (holding that former servicemember was not subject to court-martial); Covert, 354 U.S. at 5, 41, 77 S.Ct. 1222 (court-martial did not have jurisdiction during peacetime to try capital case against civilian dependent of a servicemember); Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 249, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960) (conviction by court-martial of wife of serviceman for noncapi-tal crime was not constitutionally permissible); Grisham v. Hagan, 361 U.S. 278, 280, 80 S.Ct. 310, 4 L.Ed.2d 279 (1960) (overseas civilian employee of armed services was not subject to court-martial jurisdiction in capital case); McElroy v. United States ex rel. Guagliardo, 361 U.S. 281, 283-84, 287, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960) (overseas civilian employees of the Army and Air Force were not subject to court-martial jurisdiction during peacetime).

. Verdugo-Urquidez, 494 U.S. at 270-71, 110 S.Ct. 1056 (citing Plyler v. Doe, 457 U.S. 202, 211-12, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (illegal aliens protected by Equal Protection Clause); Kwong Hai Chew v. Colding, 344 U.S. 590, 596, 73 S.Ct. 472, 97 L.Ed. 576 (1953) (resident alien is a "person” within the meaning of the Fifth Amendment); Bridges v. Wixon, 326 U.S. 135. 148. 65 S.Ct. 1443. 89 L.Ed. 2103 (1945) (resident aliens have First Amendment rights); Wong Wing v. United States, 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (resident aliens entitled to Fifth and Sixth Amendment rights); Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (Fourteenth Amendment protects resident aliens)).

. In Verdugo-Urquidez, the Chief Justice noted the contrast between the language of the Fourth Amendment which refers to "the people" with the language of the Fifth and Sixth Amendments which refer to "persons” and "accused.” 494 U.S. at 265-66, 110 S.Ct. 1056.

. The record indicates that Ali spent approximately seven days at Fort Benning, Georgia, for predeployment training. The training took place January 14, 2008, through January 21, 2008.

.In his separate opinion, Chief Judge Baker finds that Ali is entitled to the subset of Fifth and Sixth Amendment protections provided by the *269 statutory safeguards embedded in the UCMJ. United States v. Ali, 71 M.J. 256, 276-77 (C.A.A.F. 2012) (Baker, C.J., concurring in part and in the result). We agree that the UCMJ provides some, but not all. Fifth and Sixth Amendment protections to those who fall within its jurisdiction, however Ali’s fundamental argument remains based on the distinction between the full panoply of Fifth and Sixth Amendment rights afforded to United States citizens in other courts and the narrower range of these rights available to those subject to court-martial under the UCMJ.

.We note there is also precedent suggesting that civilians serving alongside the military may be subject to the military justice system. See, e.g., Duncan v. Kahanamoku, 327 U.S. 304, 313, 66 S.Ct. 606, 90 L.Ed. 688 (1946) (citing the "well-established power of the military” to assert jurisdiction over "those directly connected with” it); Ex parte Milligan, 71 U.S. 2, 123, 4 Wall. 2, 18 L.Ed. 281 (1866) ("Every one connected with [the military] ... is amenable to the jurisdiction which Congress has created for their government, and, while thus serving, surrenders his right to be tried by the civil courts.”); see also discussion of British and American Articles of War supra pp. 12-13. But that question is not before us in this case.

. In his separate opinion, Chief Judge Baker notes the Supreme Court’s call for the application of a "practical and contextual” analysis of constitutional law overseas in Boumediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). Ali, 71 M.J. at 278 (Baker, C.J., concurring in part and in the result). We agree that such an analysis is necessary in this case and note the Court's concern in Boumediene "[t]hat the petitioners in [Covert] were American citizens was a key factor in the case and was central to the plurality’s conclusion that the Fifth and Sixth Amendments apply to American civilians tried outside the United States.” Boumdiene, 553 U.S. at 760, 128 S.Ct. 2229.

. This case does not present a situation involving a United States citizen and we take no position as to that issue.

. We recognize that Ali was in Iraq pursuant to a contingency operation rather than a declared war. However, we are also cognizant of the nature of the conflict and the existence of actual hostilities.

. In regard to the issue raised in Senior Judge Effron's separate opinion, Ali, 71 MJ. at 281 (Effron, S.J., concurring in part and in the result), our holding is limited to the narrow circumstances presented by this case, namely the exercise of court-martial jurisdiction over a dual citizen of the host country and a third country. We do not reach the question of the constitutionality of court-martial jurisdiction over a nonciti-zen who is not also a host-country national.